[No. 44419. En Banc. March 16, 1978.]

PHILIP C. LASSILA, *Appellant,* v. THE CITY OF WENATCHEE, ET AL, *Respondents.*

*Niichel & Rutz, P.S.,* by *Richard J. Niichel, John R. Rutz,* and *David V. Johnson,* for appellant.

*Carlson & Drewelow, Inc., P.S.,* by *Larry Carlson* and *James B. Drewelow,* for respondents.

STAFFORD, J.—Appellant Philip Lassila sued to invalidate several actions taken by respondent City of Wenatchee (City) during redevelopment of its central business district. Appellant asserts the City violated both article 8, section 7 of the State Constitution and the mandate of RCW 43.21C, the State Environmental Policy Act of 1971 (SEPA). Appellant seeks review of a judgment of dismissal. We affirm in part, reverse in part and remand.

Redevelopment activities for the City's waterfront began in 1972 when a testamentary trustee informed the City that $280,000 was available to purchase a site and construct a suitable civic auditorium. In 1974, the Chelan County Regional Planning Council retained Naramore, Bain, Brady and Johanson (Naramore), a private consulting firm, to evaluate the need for a community center to be located near the Columbia River and adjacent to the City's central business district.

In August 1974, Naramore submitted its Riverfront Development Plan (Plan) which recommended two potential sites: the preferred site, No. 1 and an alternative site, No. 2. The Plan was comprehensive, detailing land use, transportation, economics, general design as well as implementation requirements for the City's riverfront development. The Plan "envisioned" the entire riverfront area between Walla Walla Point and the Columbia River Bridge and was bounded by Wenatchee Avenue and the Columbia River. It contained an environmental impact *assessment,* not an Environmental Impact Statement (EIS), and recognized actual implementation would require compliance with both SEPA and RCW 90.58, the Shoreline Management Act of 1971.

The City Planning Commission and the Chelan County Planning Commission conducted a joint public hearing in October of 1974 to consider incorporating the Plan into the Wenatchee Urban Area Comprehensive Plan. At the hearing, potential flooding and sewage treatment problems were discussed. Both commissions endorsed the Plan. Each made a factual finding that the environmental impact of the Plan had been evaluated and that while major impact might result from the individual projects contemplated by the Plan, a negative declaration would be entered "for the record." Thereafter, in November 1974, the City incorporated the Plan into the City's comprehensive plan.

On May 27, 1975, the City hired Central Design Collaborative (CDC) to obtain control of property within the boundaries of alternative site No. 2; to develop land use studies at that site; and to develop alternatives as required. The record does not disclose either how site No. 2 was selected or what alternatives were contemplated for study by CDC. But it is clear the CDC study did not contemplate a private theater other than as a generally compatible use.

On June 12, 1975, only 2 weeks later, the City Planning Commission, CDC and respondents Fredrick and Dorothy Mercy (Mercy) began discussing Mercy's proposal for construction of a private theater on a portion of site No. 2. By

June 30, 1975, CDC informed Mercy that by July 20 "we will be in a position to give you firm assurance that the site will be available" for the Mercy portion of the development. Two weeks later, CDC informed Mercy of the City's tentative offer to make available 47,000 square feet for a theater. The offer contained differing costs per square foot and the phrase: "purchaser lease at 9% of this value." The square footage included portions of the Just, Standard Lumber and Wade Fruit properties; all of these properties were located within site No. 2. The following day, CDC sent Mercy a confirming letter with a tentative site plan for the theater attached.

Thereafter, in August of 1975, the City purchased an option to the Just property and in October of 1975 purchased an option to the Wade Fruit property. The City had taken title to the Standard Lumber property in 1973.

In February 1976, the City applied to rezone 6.3 acres of site No. 2 from C–M (Commercial District) and W–I (Warehousing and Industrial District) to C–H (Commercial District). The 6.3–acre site included the Just, Standard Lumber and Wade Fruit properties. An environmental checklist was prepared and a proposed declaration of nonsignificance was entered.

The City Planning Commission held a rezone hearing March 13, 1976, which resulted in a recommendation that the City approve the application. On March 31, 1976, the City took title to the Wade Fruit property and one day later took title to the Just property.

Two weeks later, on April 13, 1976, the City Commissioners (1) declared portions of the Just and Standard Lumber properties, and all of the Wade property surplus to the City's needs;[1] (2) entered an agreement with Mercy dealing with the City's right to use any theater constructed by Mercy on the surplus property; and (3) held a public

---

[1] We note with some interest that the surplus property comprised a total of 47,355 square feet, which is approximately the same area contemplated for sale to Mercy as far back as July of 1975.

hearing on the rezone application. Three days later, the City sold the surplus property to Mercy. Mercy received a deed to the surplus property which contained no relevant restrictions upon Mercy's use.

Finally, On April 27, 1976, the City formally rezoned the 6.3 acres of site No. 2 and entered a declaration of nonsignificance ostensibly because the proposed declaration had been uncontested.

Appellant filed this action to rescind the sale to Mercy and to vacate the City's redevelopment activities, alleging respondents had violated both Const. art. 8, § 7 and SEPA. After respondent City and respondent Mercy had filed their answers, they entered a written agreement covering "lease back arrangements" for the theater complex. On June 2, 1976, the City prepared a preliminary environmental *assessment* for the community center complex, but no EIS. At the time of trial, the City still had not acquired all property located within site No. 2, had not prepared schematic diagrams for the community center complex, and had not prepared an EIS under either SEPA or the National Environmental Policy Act.

Following a trial to the court, the judge dismissed appellant's complaint and denied subsequent motions for reconsideration and for a new trial. Appellant sought direct review by this court.

In addition to challenging 10 findings of fact, appellant raises two basic issues. First, whether the City lent its credit, in violation of Const. art. 8, § 7, by acquiring the property, declaring it surplus, and later reselling it to Mercy. Second, whether the City violated SEPA by failing to consider environmental factors or by failing to prepare an EIS.

## I. Findings of Fact

 At the outset we note appellant has not argued or briefed six of the challenged findings of fact. Thus, he is deemed to have abandoned any claim of error as to them. *State v. Wood,* 89 Wn.2d 97, 99, 569 P.2d 1148 (1977);

*Roberts v. Atlantic Richfield Co.,* 88 Wn.2d 887, 899, 568 P.2d 764 (1977); *Highline School Dist 401 v. Port of Seattle,* 87 Wn.2d 6, 18, 548 P.2d 1085 (1976). In any event, we have reviewed the record and find all 10 findings supported by substantial evidence and thus accept them as verities. *Seattle–First Nat'l Bank v. Brommers,* 89 Wn.2d 190, 199, 570 P.2d 1035 (1977); *Heggen Constr. Co. v. Turalba,* 88 Wn.2d 711, 716, 565 P.2d 420 (1977); *Morgan v. Prudential Ins. Co. of America,* 86 Wn.2d 432, 437, 545 P.2d 1193 (1976).

## II. LOAN OF CREDIT

Next, we turn to appellant's contention that the City's acquisition of property, immediate declaration as surplus, and subsequent sale to Mercy constituted a loan of the City's credit in violation of Const. art. 8, § 7. Appellant argues the City acted as a mere financing conduit for Mercy's purchase of the theater site thus unconstitutionally lending its credit. The City responds that no constitutional violation occurred because the City received money for the property and also expected to reap future public benefits from the sale.

Const. art. 8, § 7 provides:

> *Credit Not To Be Loaned. No* county, *city,* town or other municipal corporation *shall hereafter* give any money, or property, or *loan its money, or credit to or in aid of any individual,* association, company or corporation, except for the necessary support of the poor and infirm or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

(Italics ours.) The constitution clearly specifies that the *sole* purpose for which a municipality may loan its credit is "the necessary support of the poor and infirm." *See also State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965). Neither party suggests that "necessary support of the poor and infirm" was even remotely involved here. Rather, we are presented solely with the City's purchase of

real property with the intention of reselling it to a private party.[2]

■ Purchase of property by a municipality with an intent to resell it to a private party is prohibited by Const. art. 8, § 7. *Paine v. Port of Seattle,* 70 Wash. 294, 126 P. 628, 127 P. 580 (1912). At acquisition a municipality must at very least intend *a* public purpose to insure that a later sale to a private party does not violate the constitutional prohibition. A municipality is absolutely prohibited from acting as a financing conduit for private enterprise.

Since the City acquired the Wade Fruit and Just properties[3] with the declared intention of reselling portions thereof to Mercy, there was clearly an unconstitutional loan of the City's credit. The fact that the City received value on resale does not negative the unconstitutionality of that *loan of credit.*

Receipt of value merely assures that the City did not make an unconstitutional *gift* of public funds, which is an entirely different matter.

An expected future public benefit also does not negative an otherwise unconstitutional loan. We have repeatedly held that a loan of money or credit by a municipality to a private party violates Const. art. 8, § 7 regardless of whether it may serve a laudable public purpose. *Japan Line, Ltd. v. McCaffree,* 88 Wn.2d 93, 98, 558 P.2d 211

---

[2]In this regard the trial court made the following finding of fact No. 38:

"*That when the City of Wenatchee exercised its options to purchase the J.M. Wade Fruit Company property and the Gladys Fraser Just property* described in paragraphs XXIV and XXIX herein, *the City intended to sell a portion thereof to Fredrick Mercy, Jr. and Dorothy Mercy,* but subject to certain terms and conditions for the use and public benefit of the City of Wenatchee, which were thereafter reduced to writing at the time of the sale to Mercys as referred to in paragraph XXXVI herein." (Italics ours.) Neither party challenged the italicized portion of this finding.

[3]We are concerned here with the purchase, surplus declaration, and resale of the Wade Fruit and Just properties. The findings show that the Standard Lumber property was acquired in 1973. Since there is no indication in the record that the Standard Lumber property was originally acquired with an impermissible intent, we must presume a lawful intention with respect to it.

(1977); *Port of Longview v. Taxpayers,* 85 Wn.2d 216, 231, 533 P.2d 128 (1974); *State ex rel. O'Connell v. Port of Seattle, supra* at 805–06. As we said in *Johns v. Wadsworth,* 80 Wash. 352, 354, 141 P. 892 (1914):

> The section of the constitution last quoted, in most express terms, prohibits a county from giving any money, property or credit to, or in aid of, any corporation, except for the necessary support of the poor and infirm. If the framers of the constitution had intended only to prohibit counties from giving money or loaning credit for other than corporate or public purposes, they would doubtless have said so in direct words. That agricultural fairs serve a good purpose is not questioned, but the constitution makes no distinction between purposes, but directly and unequivocally prohibits all gifts of money, property, or credit to, or in aid of, any corporation, subject to the exception noted.

*See also Port of Longview v. Taxpayers, supra* at 231. Unquestionably, the City's desire for a multipurpose theater adjacent to its contemplated community center is a commendable purpose. But, a salutary purpose does not validate an unconstitutional loan.

The City contends we should liberally construe Const. art. 8, § 7 so that an expected future benefit will validate the loan. But, as we said in *State ex rel. O'Connell v. Port of Seattle, supra* at 806:

> If Article 8, § 7 is too restrictive in its terms, that is a matter for the citizens of this state to correct through the amendatory process. It is not for this court to engraft an exception where none is expressed in the constitutional provision, no matter how desirable or expedient such an exception might seem.

Accordingly, the expected receipt of future public benefits cannot serve to validate an otherwise unconstitutional loan of credit.

### III. SEPA COMPLIANCE

Appellant next seeks to have us vacate all riverfront development activities taken by the City prior to trial. He first maintains the City failed to consider environmental

factors during the course of its planning and thus has not even made a prima facie effort to comply with SEPA. Appellant also asserts the following city activities require the preparation of an EIS: (1) the establishment of Community Center Fund No. 14; (2) the selection of alternative site No. 2; (3) the acquisition of real property at site No. 2; (4) the surplus declaration and resale of real property at site No. 2; (5) the execution of design and engineering contracts for the community center; (6) incorporation of the Plan into the City's comprehensive plan; and (7) the rezone. All seven transactions are said to constitute major actions, by the City, which significantly affect the quality of the environment under SEPA. RCW 43.21C.030(2)(c).

A basic purpose of SEPA is to require local governments to consider total environmental and ecological factors to the fullest extent when taking "major actions significantly affecting the quality of the environment." *Sisley v. San Juan County,* 89 Wn.2d 78, 82, 569 P.2d 712 (1977); *Marino Property Co. v. Port of Seattle,* 88 Wn.2d 822, 830, 567 P.2d 1125 (1977); *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 272, 552 P.2d 674 (1976). Such actions require the preparation of an EIS. An EIS is required for "'every recommendation or report on proposals for legislation . . .' which 'significantly [affects] the quality of the environment . . .'" *See* RCW 43.21C.030(2)(c) and *Byers v. Board of Clallam County Comm'rs,* 84 Wn.2d 796, 801, 529 P.2d 823 (1974).

 This is not to say that every action or every governmental recommendation requires preparation of an EIS. *See, e.g., Marino Property Co. v. Port of Seattle, supra* (transfer of title between governments and related financial devices do not require an EIS). But, when action is contemplated upon a recommendation or other major action, the responsible governmental body must make a threshold determination to ascertain whether the action or recommendation will significantly affect the quality of the environment. This threshold determination is critical for full implementation of SEPA's mandate. *See Sisley v. San*

*Juan County, supra; Norway Hill Preservation & Protection Ass'n v. King County Council, supra; Juanita Bay Valley Community Ass'n v. Kirkland,* 9 Wn. App. 59, 510 P.2d 1140 (1973). It must precede governmental action.

As we said in *Norway Hill* at page 273:

The policy of the act, which is simply to insure via a "detailed statement" the full disclosure of environmental information so that environmental matters can be given proper consideration during decision making, is thwarted whenever an incorrect "threshold determination" is made.

So, too, is the policy of the act thwarted when the governmental body fails to make any threshold determination whatsoever.

If the governmental body makes a threshold determination of "no significant impact" under SEPA, it must then demonstrate that environmental factors were considered in a manner sufficient to be a prima facie compliance with the procedural dictates of SEPA. *Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 422, 526 P.2d 897 (1974); *Eastlake Community Council v. Roanoke Associates, Inc.,* 82 Wn.2d 475, 494, 513 P.2d 36, 76 A.L.R.3d 360 (1973); *Juanita Bay Valley Community Ass'n v. Kirkland, supra* at 73. Further, before a court may uphold a determination of "no significant impact," it must be presented with a record sufficient to demonstrate that *actual* consideration was given to the environmental impact of the proposed action or recommendation.

Guided by the foregoing principles, we now turn to the challenged actions which are said to have been taken in violation of SEPA.

■ First, the establishment of Community Center Fund No. 14 requires no SEPA application. It was neither a proposal for legislation, nor a major action. The City merely created a separate fund into which monies could be placed for future planning and possible construction of a potential riverfront development. Any attempted environmental evaluation at that stage would have been purely speculative

and beyond the mandate of SEPA. *Cheney v. Mountlake Terrace,* 87 Wn.2d 338, 346, 552 P.2d 184 (1976).

Next, we turn to appellant's challenge of the City's *selection* of site No. 2, the *acquisition* of real property at that site, and the subsequent "surplus" declaration and *resale* of certain of the acquired property. We can conceive of no environmental evaluation (beyond pure speculation) that would have been possible at the time the City considered *selection* of site No. 2. Mere mental gymnastics of this kind do not require environmental evaluation. This is particularly true where, as here, the trial court made an unchallenged finding that the City had no definite plan to proceed with the community center even at the time of trial. In the same vein, the mere acquisition of real property by a local government is not a major action and has no significant effect on the quality of the environment. *Marino Property Co. v. Port of Seattle, supra* at 831. Further, a declaration that real property is "surplus" and its subsequent *resale* by a governmental body are neither major actions nor ones having a significant effect on the quality of the environment. As we said in *Marino,* SEPA is directed at the *use* of property not its *ownership. Marino Property Co. v. Port of Seattle, supra* at 831. Consequently we find no violation of SEPA in the City's apparent lack of environmental consideration prior to taking these actions.

We also hold that SEPA has no application to the City's actions in executing design and engineering contracts. The contract with CDC involved the acquisition of real property and land use studies. The contract with Real Estate Research Corporation involved a market analysis of the City's need for a community center and a hotel/motel complex. SEPA does not apply to the mere acquisition of land nor does it apply to the *authorization of CDC to acquire* such property. Concerning the market analysis and land use studies, we note that these are integral to planning. *See Shelton v. Bellevue,* 73 Wn.2d 28, 435 P.2d 949 (1968). They are conditions precedent to the preliminary decisions concerning whether a development concept should even

proceed beyond the "drawing board." While such decisional aids may have some political impact, they have no impact on the environment. Accordingly, they are neither major actions nor do they significantly affect the environment. We hold that it was not necessary for the City to make a threshold determination prior to this stage of the proceeding.

█ The City's incorporation of the Plan into its comprehensive plan presents a different problem. The City Planning Commission's recommendation that the Plan be incorporated into the City's comprehensive plan was a "recommendation or report on proposals for legislation". RCW 43.21C.030(2)(c). Consequently SEPA required the City, prior to amending the comprehensive plan, to determine whether such amendment would "significantly affect the quality of the environment."

Unfortunately, the record on review is totally inadequate. We cannot determine whether the city commissioners made the required threshold determination. And, for that matter, we cannot determine whether that body even considered the Planning Commission's findings. At best, we find that the Chelan County Regional Planning Council's agreement with Naramore required that the Plan contain an environmental impact *assessment* detailing potential impacts that would be caused by *adoption* of the Plan. The Plan actually contained such an assessment, but it did not contain an EIS. And, Naramore concluded that actual implementation of each project would require an EIS and would also require compliance with the Shoreline Management Act because of the waterfront activity contemplated.

Next, we note that the City Planning Commission and the Chelan County Planning Commission conducted a public hearing to consider incorporation of the Plan into the Wenatchee Urban Area Comprehensive Plan. The minutes indicate that flooding and sewage problems were summarily discussed. Each commission endorsed the Plan after finding that the environmental impacts had been evaluated and that *a major impact might result from implementation of*

*each project.* Yet, without explanation each commission then entered a declaration "for the record" that there would be "no significant environmental impact."

At the critical stage of the City's adoption of the Plan, the record is totally different. No findings were made. No threshold determination of environmental significance was entered in the record. Rather, the record merely indicates that the city commissioners adopted the Riverfront Development Plan as proposed by Naramore. Nothing indicates that the findings of the Planning Commission, the Naramore environmental assessment, or the flooding and sewage problems were brought to the commissioners' attention. At best, the record reveals that Mayor Grover did not recall whether the findings were considered. The minutes indicate no discussion of environmental factors.

Given this state of the record, we cannot determine whether a determination of "nonsignificance" was made when the City incorporated the Plan into its comprehensive plan. In fact, we cannot tell whether the environmental significance of the Plan was *even considered* by the commissioners. *At minimum* SEPA requires a threshold determination for such recommendations *and* an actual consideration of potential environmental significance. The city commissioners met neither requirement. Finding serious noncompliance with SEPA's mandate, we must vacate the City's amendment of its comprehensive plan.

■ Finally, we turn to the City's act of rezoning the 6.3 acres of site No. 2. The city commissioners made a "negative threshold determination" that the act of rezoning would have no significant impact on the quality of the environment. We must decide whether that determination is "clearly erroneous" in view of the record submitted and the public policy of SEPA. *Marino Property Co. v. Port of Seattle,* 88 Wn.2d 822, 830, 567 P.2d 1125 (1977); *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 275–76, 552 P.2d 674 (1976).

Here the City applied to "down zone" the property without any accompanying building permit application and

without specific plans for development. The site plan for the Mercy theater complex was at best tentative, and was neither a part of the record nor a part of the rezone application. The record indicates that the city commissioners actually considered the Planning Commission's finding of "no environmental impact." Further, the *city commissioners* also found the rezone would "substantially eliminate the possibility of incompatible uses having a negative impact" on the existing central business district. Given this record and in light of the public policy expressed in SEPA, we are not left with a definite and firm conviction that the city commissioners made a mistake in reaching their threshold determination of "no significant impact." We do not suggest, however, that all rezones will have an insignificant effect upon the quality of the environment. Rather, we specifically hold only that this rezone and this record do not suggest such an impact.

In sum, we affirm the trial court in part and reverse it in part. We affirm the determination that the rezone of the 6.3 acres of site No. 2 is valid. We reverse the trial court and hold that the sale of the "surplus" property to Mercy is void. Finally, we reverse the trial court and vacate the City's amendment of its comprehensive plan. Accordingly, the City is directed to actually consider the environmental factors involved; to determine the environmental significance of those factors prior to making any subsequent amendment of the City's comprehensive plan; and, to prepare an adequate record that will demonstrate the action taken and reasons therefor.

WRIGHT, C.J., and ROSELLINI, HAMILTON, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.

Reconsideration denied April 20, 1978.