[No. 46983.   En Banc.   December 11, 1980.]

CERTIFICATION FROM THE
UNITED STATES DISTRICT COURT
FOR WESTERN WASHINGTON
IN
UNITED STATES OF AMERICA, *Plaintiff*, v.
THE TOWN OF NORTH BONNEVILLE,
*Defendant.*

828

*John C. Merkel, United States Attorney,* and *Charles Pinnell, Assistant,* for plaintiff.

*James J. Mason,* for defendant.

*Maureen J. Dightman* on behalf of Association of Washington Cities, amicus curiae.

HOROWITZ, J.—We consider in this action the legality under our state constitution of a municipality's proposed purchase of land from the United States government. The question was certified to this court pursuant to RCW 2.60 by the United States District Court for Western Washington. We now answer the federal court's certified questions concerning the constitutionality of the proposed land transaction.

As part of a powerhouse project on the Columbia River planned by the United States Army Corps of Engineers (Corps), the relocation of most of the town of North Bonneville was contemplated. All businesses and most residences and streets were required to be destroyed or moved to accommodate the powerhouse construction. In preparation for the relocation of the town, the Corps and North Bonneville entered into a series of contracts for conveyance of land in the new townsite. Litigation arose in federal court from the Corps' refusal to convey to the municipality certain lands as provided by these contracts.

North Bonneville is an optional code city incorporated under RCW Title 35A. Approximately 700 individuals live there; if the entire original townsite were developed, it could accommodate a population of 1,500. When planning for the powerhouse began, relocation of the townspeople as a community was requested. The Corps asserted a lack of legal authority to relocate the town. This impediment was overcome by congressional enactment authorizing sale, and purchase and resale, by the Corps of land necessary for the relocation. Water Resources Development Act of 1974, Pub. L. No. 93–251, § 83, 88 Stat. 12.

In 1974 the Corps and North Bonneville first entered into contracts to hire a planning firm that could assess and engineer the relocation. The firm was to, and did, base its analysis of the relocation problem on the concept of an "Optimum Town." The possibility of town growth to the "optimum" size seems implicit in all contracts between the parties and with the firm that was planning the relocation. The planning firm emphasized the need to provide for growth so that North Bonneville could continue to accommodate the economic and social needs of its inhabitants and the surrounding rural areas that rely on it for services. The planning firm concluded that in order to maintain a solvent municipality capable of supporting essential marketing, medical, professional and social services, growth of North Bonneville to the optimum size of 1,500 individuals was necessary.

After joint approval of the planning firm's proposals, the town and the Corps entered into two contracts in 1975 for conveyance of land to the town and to individuals relocating within the town. The initial town area, platted and improved to accommodate the current population, was sold to individuals at the price of raw land. The contract provided for the town to purchase additional unimproved land at the price paid by the Corps, plus interest and costs. More than half of this land would, under the proposal, remain municipally owned, as streets, greenbelts, parks, and service facilities. The remainder would eventually be resold or leased to unidentifiable private parties at fair market value at some undetermined time in the future.

The Corps has sold several residential lots in the developed portion of the town to the municipality. However, it has refused to sell any commercial lots to the town or to purchase and resell any lots in the optimum townsite. It formally repudiated the land sale contract with the town in 1976. In 1977 the Corps filed suit in federal District Court for Western Washington, seeking a declaratory judgment relieving the Corps of its obligation to the town under the

land sale contracts and declaring that the town could not enforce the contracts in any event because acquisition of land as proposed would be beyond its authority and unconstitutional under state constitutional provisions.

The following questions of state constitutional law have therefore been certified for answer by this court:

"1. Whether the City of North Bonneville, an optional code city under the laws of the State of Washington, as part of the relocation of the residents and businesses, is authorized to purchase land for the purpose of devoting such property to both public and private uses including the platting of a portion thereof into streets and lots and sale or lease of lots to unidentifiable private parties according to the general concept such as that shown on the Final New Town Plan, Town of North Bonneville, Washington, attached.

"2. Whether the acquisition of such lands with the intent on the part of the city to resell the platted lands to unidentified parties constitutes an unlawful loan of municipal credit in violation of article 8, section 7 of the Constitution of the State of Washington."

The Corps argues that the proposed land transactions violate the state constitution either because the municipality's expenditure would not be for a "public purpose" or because the purchase and resale by North Bonneville would constitute a "loan of credit" to a private party and is thus not a public use.

I

MUNICIPALITY'S AUTHORITY/PUBLIC PURPOSE

█ As an optional code city under RCW Title 35A, North Bonneville has "the broadest powers of local self-government consistent with the Constitution of this state." RCW 35A.01.010. Such municipalities are capable of entering into contracts without restriction. *Reiter v. Chapman*, 177 Wash. 392, 31 P.2d 1005, 92 A.L.R. 828 (1934); *Shaw Disposal, Inc. v. Auburn*, 15 Wn. App. 65, 546 P.2d 1236 (1976). *See* RCW 35.21.735 ("All cities . . . shall have the

power and authority to enter into agreements with the United States").

There being no general prohibition against land transactions of the sort contemplated by the town in this case, it would appear that North Bonneville "is authorized to purchase land", as set forth in the first certified question. However, the Corps argues that constitutional limitations to "public purposes" of the municipality's powers make the proposed land acquisition unauthorized.

The Corps contends that because the acquisition of land by North Bonneville would not be solely for public purposes, it would violate article 7, section 1 (amendment 14) of the state constitution:

All taxes . . . shall be levied and collected for public purposes only.

The Corps relies on *State ex rel. Collier v. Yelle*, 9 Wn.2d 317, 115 P.2d 373 (1941), which extended this "public purposes" limitation to expenditures because

[i]f this [limitation on expenditures] did not follow, an appropriation of public moneys might be made for a private purpose, and the money so appropriated be replaced by taxation, which would, in effect, be the use of money raised by taxes, for private purposes.

*State ex rel. Collier v. Yelle, supra* at 326.

The Corps argues that the proposed acquisition by the town is not for public purposes because the private individuals who repurchase the land will ultimately benefit. It contends the risk of taxpayers' funds inherent in the land speculation contemplated by the town cannot serve the public purposes that would arise if the acquired land were to be *used* solely in a public "mode", *i.e.,* in a traditional municipal sense for services, streets, or city facilities. The Corps relies on *Healy Lumber Co. v. Morris*, 33 Wash. 490, 74 P. 681 (1903), in which this court under article 1, section 16, struck down a statute that granted the owner of timbered lands the right to condemn a right–of–way for logging roads because the judges were

of the opinion that the use under consideration must be either a use by the public, or by some agency which is quasi public, and not simply a use which may incidentally or indirectly promote the public interest or general prosperity of the state.

*Healy Lumber Co. v. Morris, supra* at 509. Article 1, section 16 of our state constitution prohibits the use of the power of eminent domain for other than public uses. The Corps asserts that because the land considered in this case could not be condemned for nonpublic uses, it cannot be indirectly acquired by the town through purchase for the same use "which may incidentally or indirectly promote the public interest."

██ ██ It is undisputed that the "mode of use" for a portion of the property the town wishes to purchase from the Corps is not municipal in nature. But restrictions such as those which governed in *Healy Lumber* have changed in the 75 years since that case was decided:

What is a public municipal purpose is not susceptible of precise definition, since it changes to meet new developments and conditions of times.

(Footnote omitted.) 15 E. McQuillin, *Municipal Corporations* § 39.19, at 32 (3d ed. 1970). More recent cases have required simply that "the object sought to be accomplished is for a public purpose" in order for the requirements of article 7, section 1, to be met. *In re Port of Seattle,* 80 Wn.2d 392, 396, 495 P.2d 327 (1972) (approving lease of public air cargo warehouses to private parties).

The case of *Anderson v. O'Brien,* 84 Wn.2d 64, 524 P.2d 390 (1974), which approved a gift of public monies to an Indian tribe for construction of industrial buildings intended to stimulate investment under article 7, section 1, is perhaps most instructive on this subject:

Stimulation of investment and job opportunity for relief of unemployment and poverty are proper public purposes within this constitutional provision.

*Anderson v. O'Brien, supra* at 70. *See also. Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963). As noted in 15

E. McQuillin, *Municipal Corporations* § 39.19, at 31–32 (3d ed. 1970):

[I]f the primary object is to subserve a public municipal purpose, it is immaterial that, incidentally, private ends may be advanced. Moreover, the public purposes for which cities may incur liabilities are not restricted to those for which precedent can be found, but the test is whether the work is required for the general good of all the inhabitants of the city. But it is not essential that the entire community, or even a considerable portion of it, should directly enjoy or participate in an improvement in order to make it a public one. . . . [T]he test of a public purpose should be whether the expenditure confers a direct benefit of reasonably general character to a significant part of the public, as distinguished from a remote or theoretical benefit.

(Footnotes omitted.)

North Bonneville has authority to enter into the proposed land transactions through the congressional enactment authorizing the relocation and through the town's general ability as an optional code city to enter into contracts. The town can rely on two manifestations of public purpose that make the contracts with the Corps constitutional under article 7, section 1. First, public purposes can be seen in the "mode of use" of a large portion of the optimum town, which would be retained by the municipality for municipal uses. Even the Corps acknowledges that purchase of property for streets, parks, and service facilities constitutes a public purpose. Second, the object of insuring the continued economic and social viability of the town by providing for growth to the optimum town size is consistent with the public purposes considered and approved in *Anderson v. O'Brien,* the last case in which this court specifically considered the applicability of article 7, section 1, to a proposed governmental expenditure. *See also* RCW 35.21.735 (expressing legislature's belief that "carrying out the purposes of federal grants or programs is . . . a public purpose").

The proposed land acquisition would, indeed, serve public purposes, and the town is thus generally authorized to proceed with the purchases. We therefore must consider whether the otherwise authorized transactions constitute an unconstitutional loan of credit under article 8, section 7 of the state constitution.

## II
### LOAN OF CREDIT

The second certified question deals with the constitutionality of the proposed land transactions under article 8, section 7 of the state constitution. It provides:

> No . . . municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm . . .

This provision is similar to that found in many state constitutions. However, this court has traditionally interpreted article 8, section 7, very strictly, striking down municipal financing schemes similar to those that have been approved in other jurisdictions with comparable constitutional provisions. *See, e.g., Port of Longview v. Taxpayers,* 85 Wn.2d 216, 533 P.2d 128 (1974) (striking down statute authorizing industrial bonds that would have provided tax–free financing for industrial development); *contra, State ex rel. Farmers' Elec. Coop., Inc. v. State Environmental Improvement Auth.,* 518 S.W.2d 68 (Mo. 1975); *Green v. Mt. Pleasant,* 256 Iowa 1184, 131 N.W.2d 5 (1964).

█ █ Even though a loan of public funds may be for public purposes, it violates article 8, section 7, if it inures to the primary benefit of private entities. *See Port of Longview v. Taxpayers, supra; Johns v. Wadsworth,* 80 Wash. 352, 141 P. 892 (1914). The holdings and language of recent cases in this court preclude many financing arrangements with arguably public purposes that provided primarily private benefits.

For instance, in *Lassila v. Wenatchee*, 89 Wn.2d 804, 576 P.2d 54 (1978), we struck down the sale of property which had been purchased by the City with the intention of reselling it to a specific private real estate developer:

> Purchase of property by a municipality with an intent to resell it to a private party is prohibited by Const. art. 8, § 7.

*Lassila v. Wenatchee, supra* at 811. In *Lassila*, the purchased realty was adjacent to a planned community center and "future public benefit" was anticipated. But, as the court stated, "[a] municipality is absolutely prohibited from acting as a financing conduit for private enterprise." *Lassila v. Wenatchee, supra* at 811. Again, in *Port of Longview*, this court struck down the statute authorizing industrial bonds:

> The financing of private enterprises with public funds is foreign to the fundamental concepts of our constitutional system.

*Port of Longview v. Taxpayers, supra* at 227, quoting *State ex rel. Beck v. York*, 164 Neb. 223, 82 N.W.2d 269 (1957).

Those cases in which we have struck down financing arrangements between governmental entities and private individuals and corporations can, however, be distinguished from the case at bar in two ways.

First, unlike *Lassila* and *Port of Longview*, in this case no specific recipient of the town's "loan of credit" can be identified. No individuals presently stand to profit from the City's risk, since the realty must by law be sold at fair market value and there is no suggestion that a ready buyer has engineered the acquisition and is now prepared to profit from the purchase and resale. In all the cases striking down financing arrangements under article 8, section 7, an identifiable private party was to immediately profit from the City's risk. Although the City in this case admittedly would be taking some risk in the land transaction, no private entity stands to gain from that loan of credit. The town is not acting as a "financing conduit." *Lassila v. Wenatchee, supra* at 811.

Second, the purpose of the acquisition distinguishes this case. The contracts must be enforced to insure the continued viability of the town. There is no suggestion that the planning firm's prognostication that growth is essential to the town's continuing existence, or its conclusion that access to additional land is necessary for that growth, were in error. The town's purpose in acquisition is similar to those considered in *PUD 1 v. Taxpayers,* 78 Wn.2d 724, 479 P.2d 61 (1971), and *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963), in which the benefits to the municipalities constituted a constitutional public use even though incidental benefit would also accrue to private entities.

In *PUD 1 v. Taxpayers,* we approved the municipality's ownership and development, with private utility companies, of electric power facilities necessary to meet future needs of the district. In approving the investment, the court stated:

> [T]he public participants gain the direct benefit of a power source to meet·their undisputed future needs. Public need, as a primary purpose behind joint projects must, of course, be recognized.

*PUD 1 v. Taxpayers, supra* at 729. In *Miller v. Tacoma, supra,* the court concluded that "urban renewal legislation is not rendered unconstitutional by reason of the fact that some of the land may be resold . . . to private interests":

> *Here one of the means chosen is the use of private enterprise . . .* We cannot say that public ownership is the sole method of promoting the public purposes . . .

*Miller v. Tacoma, supra* at 387, quoting *Berman v. Parker,* 348 U.S. 26, 99 L. Ed. 27, 75 S. Ct. 98 (1954).

> The resale or lease with conditions consistent with the redevelopment plan are *an essential and continuing part of the public purpose.*

*Miller v. Tacoma, supra* at 387, quoting *Velishka v. Nashua,* 99 N.H. 161, 106 A.2d 571, 44 A.L.R.2d 1406 (1954).

> [T]he subsequent transfer of land to private parties is . . . "merely incidental to the main public purpose."

*Miller v. Tacoma, supra* at 388.

These cases, and the case at bar, are thus distinguishable from *Port of Longview v. Taxpayers, supra* at 230, in which "private corporations . . . [stood] to gain extraordinary financial benefits" by using the municipality's credit, and from *Lassila v. Wenatchee, supra* at 810, in which the City "acted as a mere financing conduit for [the developer's] purchase of the theater site". It is, indeed, hard to see any private benefit in this case, since private purchasers would have to pay the fair market value to the town, to the Corps, or to a private seller.

*Lassila* acknowledged that the existence of a public purpose in some instances can save a loan of credit from unconstitutionality by insuring that the municipality's expenditure is not for private use:

> At acquisition a municipality must at very least intend *a* public purpose to insure that a later sale to a private party does not violate the constitutional prohibition.

*Lassila v. Wenatchee, supra* at 811 (italics in original). The existence of a public purpose insures the validity of the proposed land transaction under article 8, section 7, when *no identifiable private entity is the recipient* of the municipality's "loan of credit" in purchasing the land.

Article 8, section 7 was made a part of the constitution in order to prevent abuse by railroads and other powerful private entities that might demand subsidies before locating in communities desirous of their economic and social favors. *See PUD 1 v. Taxpayers, supra* at 726–27. That danger continued to exist in recent cases in which we have struck down proposed financing arrangements between municipalities and private entities. For instance, in *Lassila* the facts reflected an "engineered" land acquisition and sale, aided by hurried environmental assessments, solely for the benefit of an individual developer who contacted the municipality *prior* to the property purchase. In *Port of Longview,* the multimillion dollar bond issue struck down was created expressly to bring development funds to one large corporation.

In this case, on the other hand, there is no evidence that a "loan of credit" to *any* private entity is intended. Indeed, no one has suggested a potential purchaser for the property in the optimum town at this point. Unlike financing arrangements struck down under article 8, section 7, in this case a large portion of the acquired property would go to undisputedly municipal uses as streets, parks, and service facilities. Finally, it is undisputed that the proposed land acquisition is sought for the public purpose of insuring the continued viability of North Bonneville as a governmental entity.

For the reasons stated above, therefore, we answer the United States District Court for Western Washington by declaring that the proposed land acquisitions are within the town's authority and that the land transactions do not violate article 8, section 7 of the Washington State Constitution.

UTTER, C.J., and ROSELLINI, STAFFORD, BRACHTENBACH, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.