[No. 64492-1-I.   Division One.   July 5, 2011.]

*In the Matter of the Limited Tax General Obligation Bonds of the City of Edmonds.*

THE CITY OF EDMONDS, *Respondent*, v. ROWENA ROHRBACH, *as Public Representative, Appellant.*

514

*Steven J. Peiffle*, for appellant.

*William H. Patton* and *Hugh D. Spitzer* (of *Foster Pepper PLLC*), for respondent.

¶1 SCHINDLER, J. — The city of Edmonds (City) authorized the issuance of $4.2 million in taxpayer bonds to extend and complete its fiber optic network in order to convert to a wireless water meter system, as well as provide broadband access to police, fire, and other public institutions. Because the issuance of the bonds is primarily for a public purpose, the City has the authority to allow private individuals and nongovernmental organizations to use the current excess capacity of its high-speed broadband network. We hold that the City's decision to issue the taxpayer bonds does not violate article VII, section 1 of the Washington State Constitution and is not an unconstitutional gift of funds or lending of credit in violation of article VIII, section 7.

## FACTS

¶2 The facts are not in dispute. In November 2004, the Edmonds City Council formed a Citizens Technology Advisory Committee (CTAC). The "Edmonds CTAC Charter" defines the objective of the committee as follows:

> Within the framework of this charter, the CTAC seeks to advance the City's interests by identifying and recommending viable technologies that will:
>
> – Stimulate economic activity within the City and help attract the types of businesses that will add to the City's economic vitality and stabilize the operating revenues of City Government.
> – Allow City services to be offered in a way that optimizes the efficiency of the City Worker while improving the quality of service delivered to Edmonds Citizens.
> – Improve Public Safety functions by enabling seamless inter-jurisdictional communication and enabling more efficient deployment of Public Safety resources.
> – Help stabilize / recover Utility Tax and Franchise fee revenue.

In March 2005, the CTAC issued a "Municipal WiFi Issue Paper" analyzing the need to create a city-owned high-speed broadband network.

¶3 In June 2005, the Washington State Department of Transportation (WSDOT) requested expedited approval of permits and use of city-owned right-of-way to install 36 strands of fiber optic cable to link the Edmonds Ferry Terminal to the existing WSDOT fiber optic cable that runs along Interstate 5. The fiber optic link to the Edmonds Ferry Terminal was part of an infrastructure security initiative funded by the Department of Homeland Security.

¶4 In exchange for the City's agreement to expedite approval and the use of its right-of-way, WSDOT gave the City access to 24 of the 36 strands of fiber optic cable. WSDOT also agreed to allow the City to determine place-

ment and installation of the fiber optic cable. The City requested installation and termination of the 24 strands at the Public Works Administration Building. The public works building is located near the Public Safety Building in downtown Edmonds.

¶5 In late 2005, the City joined a consortium that owns and operates a 256-strand fiber optic cable that runs underground "from downtown Seattle to the King/Snohomish County Line along the centerline of Hwy 99." The consortium includes the city of Seattle, King County, and the University of Washington. As a member of the consortium, the City was able to use 6 unallocated strands of fiber optic cable.

¶6 In December 2006, the City completed construction of a link connecting the 24 fiber strands at the Public Works Administration Building to the 6 strands located at the county line under Highway 99, providing

> a direct link to the regional internet connection hub at the Westin building in downtown Seattle and the fibers it had previously acquired from WSDOT running from the ferry terminal to the City's Public Works Administration building off 212th Street in Edmonds.

Completion of this link allowed the City to provide broadband Internet service to other public institutions in the City, such as the Edmonds School District, Stevens Hospital, and Edmonds Community College, as well as other broadband users. By using its own broadband fiber optic network, the City obtained significant cost savings and performance improvements.

¶7 The overall transmission capacity, or bandwidth, of a fiber optic network is defined by the smallest segment. Each strand of the City's fiber optic network simultaneously transmits and receives up to 10 gigabits (10 billion bits) per second (Gbps), or 10,000 megabits (10,000 million bits) per second (Mbps). Using the smallest segment of the City's current fiber optic network, the six-strand link from the City to downtown Seattle, the current capacity is 60

Gbps. The bandwidth of the segment connecting the Edmonds Ferry Terminal to the Public Works Administration Building is 240 Gbps. It is anticipated that in the near future, it may be possible to expand the bandwidth of each strand to 100 Gbps.

¶8 On April 16, 2008, fiber optic network consultant Rick Jenness issued the "Edmond['s] Fiber Network" report (Report) addressing the City's use of the fiber optic network as well as use by "other governmental, educational and not-for[-]profit institutions." The "Introduction" to the Report states that the City had been working for several years to establish a fiber optic network "to reduce municipal telecommunications costs while increasing telecommunications functionality." In addition, the Introduction also states that the City had "examined two other uses for this network: providing high speed broadband access to other local governmental and not-for-profit entities, and expanding the network to provide . . . services for residents and businesses."

¶9 The Report recommends the City move ahead with "the development of the Edmond[] Fiber Network (EFN) for internal and intergovernmental uses." The Report points out that future excess capacity would allow the City to offer access to the network to residents and businesses. However, based on estimates of the cost to provide a connection to each home, the Report recommends against expanding the network to provide service to all residential and commercial users.

¶10 The Report recommends proceeding with a proposed project to extend the fiber network geographically in order to replace the water meters throughout the City with a wireless system. According to the Report, utility savings would offset the costs of replacing the water meters. The Report describes the proposed wireless water meter reading project as follows:

By extending the EFN northward to the Seaview area, and southward towards Esperance area, the City can provide a

wireless communications infrastructure capable of remotely reading every water meter in the City without the need for employees of the Water Department to drive to each location and manually capture the meter value. Currently 37% of the City's meters are over 20 years old, and a full 66% are over ten years old. As meters get older, their accuracy degrades causing lost revenue to the City.

To read meters centrally, several radio reception points are needed to be located in various parts of the City. These reception points would be connected to the central office via an expansion of the City's fiber optic backbone. The base cost of meter replacement (necessary in any event) is estimated at just under $2.0 million. Moving to smart meters adds just over $2.0 million.

The Report sets forth the following costs for the project:

| ITEM | BASE METER REPLACEMENT | SMART METER COSTS | TOTAL COST |
|---|---|---|---|
| Replacement Water Meters | $1,776,299 | | $1,776,299 |
| Meter Radios | | 1,254,875 | 1,254,875 |
| Base Station | | 180,700 | 180,700 |
| Tower and Base | | 50,000 | 50,000 |
| Fiber Extensions | | 100,000 | 100,000 |
| Switching Equipment | | 75,000 | 75,000 |
| WiFi Communications | | 300,000 | 300,000 |
| Sales Tax | 135,887 | 149,984 | 285,857 |
| Grand Total | $1,912,186 | $2,110,559 | $4,022,731 |

¶11 The City conducted a study of the wireless meter reading project, analyzing the costs and benefits. The study estimates that the cost savings from a wireless water meter system are significant and that the costs incurred in converting to a wireless system would be offset in eight years.

¶12 In July 2008, the City issued the "Edmonds Broadband Initiative Confidential Executive Summary." The City recommended extending "the existing WSDOT backbone to

connect other public sector partners who require high volume internet capacity," and creating "a fiber optic ring that would connect the 5 major zones of the City" to allow "[e]lectronic [m]eter reading"[1] and access by police officers, fire fighters, fire marshals, inspectors, and public works employees "while working in the field." According to the Executive Summary, "[b]ecause of the large capacity of the fiber optic technology," consideration should also be given to leasing "some of this excess capacity to commercial and residential users within the City thus accelerating the payback time of the investment."

¶13  On December 16, the city council adopted Ordinance 3721. Ordinance 3721 authorizes issuing $4.2 million in general tax obligation bonds to install 24 strands of cable to connect the City's existing fiber optic network backbone to radio towers in order to "construct a wireless water meter system and extend and improve the City's fiber optic network both to support that system and for other municipal and public purposes." Ordinance 3721 states that completion of the network will allow the City to convert "all of the City's water meters over to wireless meters that are read from centralized receivers connected to the fiber backbone" and provide "police, fire and other City employees" in the field with "wireless broadband connectivity." Ordinance 3721 also states that installation of 24 strands is "the most economical size to install due to its increased durability, wide availability and commodity like pricing." Installing 24 strands results in significant current excess capacity of approximately 239,980 Mbps, or 99.9916 percent in available capacity.

¶14  Ordinance 3721, section 1 sets forth the city council's findings:

> 1.1 The City desires to construct, own and operate a wireless water meter system to replace its existing water meter system.

> 1.2 The City currently owns and operates a high capacity telecommunications fiber optic network that serves the City's

---

[1] (Boldface omitted.)

utility operations, public safety operations and other City services, and desires to extend and improve that system in order to support the new wireless water meter system and to enhance other utility operations, public safety operations, and other public services.

1.3 The extension and improvement of the City's existing fiber optic network creates excess capacity that may be used to provide access to ultra high capacity internet and other telecommunications services; capacity for accommodating expanding technologies and demand; intergovernmental coordination and services (including educational and health institutions); and more and faster service to members of the public who are in need of those services.

1.4 The City is in need of financing a wireless water meter system and the extension and improvement of the City's fiber optic network (the "Project," as defined in Section 3 . . . ), the estimated total cost of which is more than $4,200,000, and the City does not have available sufficient funds to pay the cost.

1.5 To pay costs of the Project, the City Council finds it necessary and advisable that the City issue and sell its limited tax general obligation bonds in the principal amount of not to exceed $4,200,000.

¶15 Based on the findings, the ordinance authorizes issuance of the bonds, describing the public purpose as well as the intent to contract for use of the excess capacity with private individuals and entities. Ordinance 3721, section 3 provides:

The City shall borrow money on the credit of the City and issue negotiable limited tax general obligation bonds evidencing that indebtedness as described in Section 4, for general City purposes to provide part of the funds with which to design and construct a wireless water meter system and extend and improve the City's fiber optic network both to support that system and for other municipal and public purposes (the "Project") (a) to enable timely, efficient and cost-effect [sic] water meter reading; (b) for use by City departments in order to enhance other utility operations, public safety operations, and other City services, (c) for use by other governmental, educational and health institutions pursuant to interlocal agree-

ments and other contractual arrangements, and (d) to the extent capacity is available, for use under contract by private persons and entities that need access to high capacity internet and other high capacity telecommunications services, and to pay the costs of issuance and sale of the bonds (the "costs of issuance"). The general indebtedness to be incurred shall be within the limit of up to 1½ % of the value of the taxable property within the City permitted for general municipal purposes without a vote of the qualified voters therein.

¶16 On December 23, the City filed a declaratory judgment action to determine the validity of Ordinance 3721 and the decision to issue taxpayer bonds to expand the fiber optic network. The complaint describes the history of the current fiber optic network and states that the purpose of the bonds is to extend and improve the fiber optic network in order to provide funding to design and construct a wireless water meter system and use the network for other governmental purposes. The complaint describes the anticipated use of the network for "public safety and public works operations," as well as providing "high capacity bandwidth communication to numerous other government entities." Paragraph 22 of the complaint identifies a "fourth use" as the ability "to provide high bandwidth communication to individuals and non-government organizations that need access to high capacity internet connections."

¶17 The trial court designated Rowena Rohrbach as the taxpayer representative for the declaratory judgment action, and appointed counsel to represent Rohrbach and the taxpayers. Rohrbach's answer admits all allegations in the complaint except paragraph 22. As to paragraph 22, the answer asserts that as a matter of law, the City is not authorized to "create public bonded indebtedness in part for the purpose of providing high band-width communications facilities for private use," and state law does not authorize the City to provide telecommunication services.

¶18 The City filed a motion for summary judgment. The City argued that as a matter of law, it has the authority to issue tax obligation bonds to extend the fiber optic network

for public purposes, as well as allow the public to use the currently existing excess capacity. In support, the City submitted a number of declarations from a number of business owners interested in using the City's network, including Dewar Meeks & Ekrem CPA and Europe Through the Back Door. In opposition, Rohrbach argued that the City was not authorized to issue taxpayer obligation bonds for a project that also benefits individuals and businesses, and the City has no authority to provide telecommunications services.

¶19 The trial court granted the City's motion for summary judgment. The court ruled that the City was authorized to issue taxpayer bonds and, to the extent available, the City had the authority to allow businesses and private individuals to use the current excess capacity of its fiber optic network. The court's order states, in pertinent part:

1. The City of Edmonds' Motion for Summary Judgment is GRANTED.

2. The use of excess capacity on the City of Edmonds' high speed fiber optic communication system by private individuals and non-governmental businesses and organizations that need access to ultra high bandwidth communication is DECLARED to be a lawful public purpose of the City of Edmonds under its general "home rule" powers as a code city organized under Title 35A RCW and under the express statutory authority to engage in economic development programs under RCW 35.21.703.

3. The bonds authorized by Edmonds Ordinance No. 3721 are DECLARED valid in all respects, including the use of the bonds for enhancement of the City's high speed fiber optic communication system

   a. to enable timely, efficient and cost-effective water meter reading;

   b. for use by City departments in order to enhance other utility operations, public safety operations, and other City services;

   c. for use by other governmental, educational and health institutions pursuant to interlocal agreements and other contractual arrangements;

    d.   to the extent capacity is available, for use under contract by private persons and entities that need access to high capacity internet and other high capacity telecommunications services; and

    e.   to pay the costs of issuance and sale of the bonds.

Rohrbach appeals.

## ANALYSIS

¶20 Rohrbach contends that the City does not have the statutory authority to issue taxpayer obligation bonds to expand the fiber optic network for both a public purpose and the stated intent to allow private individuals and businesses to use the available current excess capacity.

¶21 The City filed this declaratory judgment action under chapter 7.25 RCW to determine the validity of Ordinance 3721 and the issuance of taxpayer obligation bonds. RCW 7.25.010 provides, in pertinent part:

> Whenever the legislative or governing body of . . . any county, city, school district, other municipal corporation, taxing district, or any agency, instrumentality, or public corporation thereof shall desire to issue bonds of any kind and shall have passed an ordinance or resolution authorizing the same, the validity of such proposed bond issue may be tested and determined in the manner provided in this chapter.

¶22 In *King County v. Taxpayers of King County*, the Washington State Supreme Court adopted a three-part test to use in determining the validity of the issuance of taxpayer bonds in a declaratory judgment action under RCW 7.25.010:

> "1. Is there legislative or constitutional authority delegated to the municipality to issue the bonds for the particular purpose?
>
> "2. Was the statute authorizing the bond issue constitutionally enacted? If not constitutionally enacted or if unconstitutional for any other reason, the issue is void and recitals are of no effect.

"3. Is the purpose for which the bonds are issued, a public and corporate purpose, as distinguished from a private purpose?"

133 Wn.2d 584, 594-95, 949 P.2d 1260 (1997) (quoting 15 EUGENE MCQUILLIN, MUNICIPAL CORPORATIONS § 43.04, at 575 (rev. 3d ed. 1995)). The City has the burden of establishing the validity of the ordinance authorizing issuance of the bonds under RCW 7.25.010. *King County*, 133 Wn.2d at 595.

*Legislative and Constitutional Authority To Issue Taxpayer Bonds*

¶23 Citing to RCW 35A.40.080, Rohrbach claims the City does not have the express authority to issue taxpayer bonds as authorized by Ordinance 3721. We disagree.

¶24 Article XI, section 11 of the Washington State Constitution gives code cities the authority to "make and enforce within [their] limits all such local police, sanitary and other regulations as are not in conflict with general laws."

¶25 The City was incorporated under the Optional Municipal Code, Title 35A RCW. Optional Municipal Code cities are vested with broad legislative powers limited only by the restriction that an enactment cannot contravene the constitution or directly conflict with a statute. RCW 35A.11.020; *Heinsma v. City of Vancouver*, 144 Wn.2d 556, 560, 29 P.3d 709 (2001); *Winkenwerder v. City of Yakima*, 52 Wn.2d 617, 622, 328 P.2d 873 (1958).

¶26 As a code city, the City is authorized to incur debt or borrow money for "strictly municipal purposes" without a vote of the taxpayers for "the amount of indebtedness authorized by chapter 39.36 RCW." RCW 35.37.040; *see also* RCW 39.36.020(4) (requiring strictly municipal purpose for indebtedness under chapter 39.36 RCW).[2]

---

[2] RCW 35.37.040 provides, in pertinent part:

Every city and town, may, without a vote of the people, contract indebtedness or borrow money for strictly municipal purposes on the credit of the city or town

¶27 Nonetheless, Rohrbach argues that under RCW 35A-.40.080, the City does not have express authority to issue taxpayer bonds to expand the fiber optic network. The plain language of RCW 35A.40.080 does not support Rohrbach's argument. RCW 35A.40.080 unambiguously allows a code city to issue taxpayer bonds as authorized by other statutes, including RCW 35.37.040 and RCW 39.36.020. RCW 35A-.40.080 provides:

> *In addition to any other authority granted by law*, a code city shall have authority to ratify and fund indebtedness as provided by chapter 35.40 RCW; to issue revenue bonds, coupons and warrants as authorized by chapter 35.41 RCW; to authorize and issue local improvement bonds and warrants, installment notes and interest certificates as authorized by chapter 35.45 RCW; to fund indebtedness and to issue other bonds as authorized by chapters 39.44, 39.48, 39.52 RCW, RCW 39.56.020, and 39.56.030 in accordance with the procedures and subject to the limitations therein provided.[3]

¶28 Rohrbach also asserts the City does not have the authority to operate a fiber optic network and provide private individuals and businesses with access to the network. But Rohrbach cites no authority expressly prohibiting the City from operating a fiber optic network and allowing access to its network. And in an analogous case, *City of Issaquah v. Teleprompter Corp.*, 93 Wn.2d 567, 572-75, 611 P.2d 741 (1980), the Washington State Supreme Court held that absent an express legislative enactment to

---

and issue negotiable bonds therefor in an amount which when added to its existing nonvoter approved indebtedness will not exceed the amount of indebtedness authorized by chapter 39.36 RCW, as now or hereafter amended, to be incurred without the assent of the voters.

Under RCW 39.36.020(2)(a)(ii), a code city may incur indebtedness of less than 1.5 percent of the assessed value of property in the city without a vote of the taxpayers. *King County*, 133 Wn.2d at 608-09. Rohrbach does not argue that Ordinance No. 3721 exceeds the City's debt threshold.

[3] (Emphasis added.)

the contrary, the city of Issaquah was not prohibited from owning, operating, and providing cable television services.[4]

*Issuance of Taxpayer Bonds for a Public Purpose*

¶29 Rohrbach also contends that Ordinance No. 3721 violates article VII, section 1 of the Washington State Constitution and RCW 35.37.040 because the City is not issuing taxpayer bonds strictly for public purposes. Rohrbach concedes that the bonds are being issued for a public purpose but asserts that because the City's current use is only 0.0014 percent of the available bandwidth, the network primarily benefits private individuals and businesses.

¶30 Article VII, section 1 of the Washington State Constitution provides, in pertinent part, "All taxes . . . shall be levied and collected for public purposes only." Public funds cannot be used "to benefit private interests where the public interest is not primarily served." *Japan Line, Ltd. v. McCaffree*, 88 Wn.2d 93, 98, 558 P.2d 211 (1977). Accordingly, the expenditure of public funds by the municipality must further public purposes. *CLEAN v. State*, 130 Wn.2d 782, 792-93, 928 P.2d 1054 (1996).

¶31 What constitutes a " 'public municipal purpose is not susceptible of precise definition, since it changes to meet new developments and conditions of times.' " *United States v. Town of North Bonneville*, 94 Wn.2d 827, 833, 621 P.2d 127 (1980) (quoting 15 EUGENE MCQUILLIN, MUNICIPAL CORPORATIONS § 39.19, at 32 (3d ed. 1970)). In *CLEAN*, our Supreme Court concluded that " '[a]n expenditure is for a public purpose when it confers a benefit of reasonably general character to a significant part of the public.' "

---

[4] We note that courts in other jurisdictions have reached the same conclusion as to telecommunication services. *See In re Application of Lincoln Elec. Sys.*, 265 Neb. 70, 80-87, 655 N.W.2d 363 (2003) (holding that a "home rule" city has the legal authority to provide telecommunication services incidental to other public purposes), *overruled on other grounds by Nixon v. Mo. Mun. League*, 541 U.S. 125, 124 S. Ct. 1555, 158 L. Ed. 2d 291 (2004); *GTE Nw. Inc. v. Or. Pub. Util. Comm'n*, 179 Or. App. 46, 39 P.3d 201 (2002) (holding that a county with "statutory home rule" powers has the authority to provide telecommunication services).

*CLEAN*, 130 Wn.2d at 793 (quoting *In re Marriage of Johnson*, 96 Wn.2d 255, 258, 634 P.2d 877 (1981)).

¶32 In *CLEAN*, the court rejected the argument that the county's issuance of taxpayer bonds violated article VII, section 1 if private individuals or businesses also benefit. In *CLEAN*, the court addressed the question of whether the county's decision to issue taxpayer bonds to construct a baseball stadium violated Washington Constitution article VII, section 1. *CLEAN*, 130 Wn.2d at 792. The court deferred to " 'the judgment of the legislature' " and held that issuance of the taxpayer bonds would further public purposes even though the privately owned baseball club would also benefit from the expenditure of public funds. *CLEAN*, 130 Wn.2d at 792-97 (quoting *Anderson v. O'Brien*, 84 Wn.2d 64, 70, 524 P.2d 390 (1974)), 821 (Guy, J., concurring and dissenting).

¶33 Likewise, in *Chandler v. City of Seattle*, 80 Wash. 154, 155-57, 141 P. 331 (1914), the court upheld issuance of bonds to expand the municipal electricity plant. The planned expansion increased available electricity and reduced the cost of electricity. To further offset the cost, the city planned to sell excess electricity and surplus steam power to private parties. *Chandler*, 80 Wash. at 156-57. The court held that where a project has both public and private purposes, the expenditure of public funds is authorized as long as the "bona fide intention"[5] is for a public purpose. *Chandler*, 80 Wash. at 159.

¶34 Rohrbach also argues the City must establish that the fiber optic network is necessary for "the continued economic and social viability" of the City. *Bonneville*, 94 Wn.2d at 834. In an attempt to narrowly define a public purpose, Rohrbach misstates the holding in *Bonneville*. In *Bonneville*, the court held that the city had authority to enter into land transactions with the government because the agreement directly benefited a significant number of the city's residents and would allow the city to grow.

---

[5] (Italics omitted.)

*Bonneville*, 94 Wn.2d at 834. The court states that the fact that private ends are incidentally advanced is immaterial to the determination of whether legislation furthers a public purpose. *Bonneville*, 94 Wn.2d at 834. Likewise, in *CLEAN*, the court stated that " '[w]here it is debatable as to whether or not an expenditure is for a public purpose, we will defer to the judgment of the legislature.' " *CLEAN*, 130 Wn.2d at 793 (quoting *Anderson*, 84 Wn.2d at 70). While the court concluded that the question of whether the construction of the baseball stadium would have an economic benefit was "debatable," the court deferred to the legislative findings that the new stadium would result in additional jobs, entertainment, and tourism. *CLEAN*, 130 Wn.2d at 796-97.

¶35 Here, as in *CLEAN* and *Chandler*, the record supports the determination that the City's issuance of bonds to expand the fiber optic network furthers public purposes. Ordinance No. 3721 expressly states that the primary purpose of issuing the taxpayer bonds is to expand the City's fiber optic network in order to convert to a wireless water meter system. The City already has excess bandwidth capacity. Ordinance No. 3721 authorizes extension of the geographic reach of the City's fiber network throughout the entire City. The undisputed record also shows that the vast majority of the revenue generated by the bonds will be used to replace the existing water meters and install meter radios. Of the $4.2 million in taxpayer bonds, approximately $1.8 million will be spent on replacing water meters, and approximately $1.3 million on meter radios. By contrast, only $100,000 is needed to install the cable necessary to geographically extend the fiber optic network for the wireless water meter project. There is also no dispute that the wireless water meter project and use of the network for public safety purposes will improve services for the residents and save money. The City's plan to allow additional public sector and intergovernmental agencies, and private individuals and businesses to use the current network "to the extent capacity is available" does not violate article VII, section I.

¶36 Rohrbach also asserts that issuing bonds to expand the fiber optic network violates article VIII, section 7 of the Washington State Constitution. Washington Constitution article VIII, section 7 provides:

> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

¶37 " 'The manifest purpose of [article VIII, section 7] is to prevent state funds from being used to benefit private interests where the public interest is not primarily served.' " *CLEAN*, 130 Wn.2d at 797 (quoting *McCaffree*, 88 Wn.2d at 98). In determining whether an expenditure of public funds violates article VIII, section 7 we look at consideration and donative intent. *Gen. Tel. Co. of Nw., Inc. v. City of Bothell*, 105 Wn.2d 579, 588, 716 P.2d 879 (1986). Courts do not inquire into the adequacy of consideration unless there is proof of donative intent or a grossly inadequate return. *Adams v. Univ. of Wash.*, 106 Wn.2d 312, 327, 722 P.2d 74 (1986).

¶38 Rohrbach's reliance on *Lassila v. City of Wenatchee*, 89 Wn.2d 804, 576 P.2d 54 (1978) is unpersuasive. In *Lassila*, the Washington Supreme Court held that the city's decision to purchase property with the intent to resell it to a private party violates Washington Constitution article VIII, section 7 even if the city received a fair price and the sale furthered the city's development efforts. *Lassila*, 89 Wn.2d at 811-12.

¶39 In *CLEAN*, the court distinguished *Lassila* in holding that the issuance of taxpayer bonds to construct a sports stadium was not an unconstitutional gift of public funds to the private tenant because the county remained the owner of the stadium and the private tenant had to pay reasonable rent. *CLEAN*, 130 Wn.2d at 798-99.

> Again, the situation we faced in *Lassila* is not analogous to the present case. There, the City of Wenatchee was essentially

acting as a middle person for a private enterprise. Wenatchee received nothing of value for its expenditure of public money and no public purpose was served by the expenditure. Here, unlike the situation in *Lassila*, we can discern no intent on the part of the Legislature to have the stadium sold to the Mariners, the Stadium Act providing that ownership of the facility is to remain in the hands of the public facilities district.

*CLEAN*, 130 Wn.2d at 799.

¶40 Here, as in *CLEAN*, there is no question that the City will own the fiber optic network and plans to charge private individuals or businesses to use the available current excess capacity.

## CONCLUSION

¶41 Because issuance of the taxpayer bonds as authorized by Ordinance 3721 is for the primary purpose of expanding the fiber optic network in order to replace water meters with a wireless water meter system, as well as to provide public safety officers access to the network, we conclude the City has the statutory and constitutional authority to issue the bonds, and affirm.

GROSSE and ELLINGTON, JJ., concur.