**FILED**
**NOVEMBER 22, 2022**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 38656-2-III |
| M.A.B. | ) | (Consolidated with |
| | ) | No. 38669-4-III) |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, C.J. — In these consolidated appeals, the parents of now-15-month-old M.A.B. appeal the order finding him dependent under RCW 13.34.030(6)(c). They challenge the trial court's finding that they are not capable parents and collectively challenge three other factual findings. They also challenge the trial court's legal conclusion that M.A.B. is a dependent child. Because evidence in the record supports the challenged findings and the trial court's findings support its conclusion that M.A.B. is dependent, we affirm.

FACTS AND PROCEDURAL BACKGROUND

The following facts are taken from the trial court's unchallenged findings of fact in the dependency order, which are verities on appeal, *e.g.*, *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015), or are otherwise uncontested in the proceedings below.

No. 38656-2-III (consol. w/ No. 38669-4-III)
*In re Dependency of M.A.B.*

M.A.B. was born on August 1, 2021, to a mother and father who had a long history of involvement with the Department of Children, Youth and Families (Department) over the welfare of the couple's four older children. Intakes involving the parents' four older children conveyed concerns about the children's school absences, dirty appearance, chronic lice, unsanitary and unsafe housing, and parental substance abuse and mental health issues. The parents agreed to dependencies for the four children in December 2018. During those dependencies, the parents were ordered to complete drug and alcohol evaluations and recommended treatment, parenting education, a psychological evaluation for the mother and recommended treatment, random urinalysis (UAs), and to obtain safe and stable housing. The parents completed parenting classes but did not engage in a substance use assessment or treatment and did not comply with court-ordered UAs.

When the parents failed to remediate their parental deficiencies, the Department filed a petition to terminate their parental rights to each of the four children. The parents agreed in August 2020 to relinquish their parental rights.

The Department received another referral concerning the parents and newborn M.A.B. on August 2, 2021. It was reported that the mother had given birth to M.A.B. in a van and that later, at the hospital, M.A.B. had tested positive for methamphetamine.

Department social worker Veronica Mabee met with the parents at the hospital on August 2. Both denied any recent drug use. The father provided an oral swab to Ms. Mabee that later tested positive for methamphetamine. The parents told Ms. Mabee they were living in a van on the parental grandparents' property.

The Department petitioned for a dependency for M.A.B. on August 3. At the shelter care hearing held shortly thereafter, the trial court found M.A.B. in need of shelter care and he was placed in licensed foster care. A Department social worker, Crystal DeLancy, then met with the parents and offered them services, including assistance in obtaining housing, assistance in accessing mental health services and substance abuse assessment and treatment, and parenting education. On the eve of the contested fact-finding hearing, Ms. DeLancy met with the parents again and requested that they participate in oral swab testing for substance use. Both declined.

The fact-finding hearing was held on October 7, 2021. Among the contested issues at the hearing was the parents' suspected drug use. Ms. Mabee testified that the referral to the Department was based on M.A.B. testing positive for methamphetamines and amphetamines. She testified that drug use is known to affect a parent's ability to properly care for a child, especially a newborn who needs 24-hour care. She testified to administering the oral substance swab to the father at the hospital.

Ana Gonzalez, who had worked with the parents during the dependency and termination proceedings for the four older children, testified about her history with the parents. Among other matters, she testified that the parents' visits with the four older children were always supervised, in part because of concerns about possible parental drug use at a visit. She testified there was also a concern about the parents' ability to handle all four children at a visit, and there was inconsistency in the parents' visits.

Irene Shu, the scientific director of the laboratory that tested the father's oral swab and reported positive results for methamphetamine and amphetamine, testified that no substance other than methamphetamine could have produced the father's positive result. She testified that a positive result was evidence of recent use, because methamphetamine is typically only detectable for one and a half days after consumption. Asked if it would be possible for an individual to test positive for methamphetamine as a result of proximity to a user, Ms. Shu said that powder in the environment that was unknowingly ingested could lead to a positive result.

The mother denied ever having used any drugs other than marijuana, which she testified she used because she has Crohn's disease and it helps with her digestion. But Barbara Bourgeois, a registered nurse who worked in the nursery of the hospital where M.A.B. was cared for after his birth, testified that the mother and M.A.B. both tested

positive for methamphetamine. Her testimony drew an objection that was ultimately overruled:

> Q  Did anything in the file indicate that the child or mother were exposed to substances before the child was born?
>
> A  You mean did we have information?
>
> Q  Yes.
>
> A  Well, labs are done on, a urine drug screen on the mother. And then we do a urine drug screen on the babies and also we send a piece of umbilical cord to the—I'm not sure if it actually goes to the University of Washington or it's a send out. And that also checks for drugs of abuse.
>
> Q  And did—did those tests reveal any exposure [for drugs of abuse]?
>
> A  Yes, I know methamphetamine was there, that's—
>
> [MOTHER'S COUNSEL]: Objection, hearsay. She's talking about some tests but we don't know where it's coming from.
>
> THE COURT: Yeah, you're gonna have to—I'm gonna sustain that. You're probably gonna have to probably lay some more foundation because I'm not really sure exactly what tests we're talking about.
>
> Q  Do you know what tests are completed on the cord or to—
>
> A  It's a drug screen. I believe it's a qualitative. What we do in the hospital is quantitively. And it shows that it's there. I might have those backwards. But the one that goes to the state or the send out lab actually shows amount of whatever is there.
>
> Q  And could exposure to these substances affect the baby?
>
> A  Yes.
>
> Q  And would that influence your observations of the baby or how you care for the child?
>
> A  Yes.
>
> Q  So, did you rely on information in this file to provide care to this baby?

5

> A    Yes.

> Q    And was some of that information that the baby had been exposed to methamphetamine?

> A    Yes.

> [MOTHER'S COUNSEL]: I'm gonna renew my objection.

> THE COURT: So, I don't think she's explained where the methamphetamines came from. There was a lot of discussion about whether it's umbilical cord or I'm not really clear on that. *But I think she can testify to the fact that she's caring for the child. She relied on this information well, regardless of where it came from to care for this baby. So, for that purpose I'll allow it.*

Report of Proceedings (RP) at 82-84 (emphasis added).

The father testified that he was prescribed oxycodone under a pain contract with his doctor. He was not asked about and did not deny other drug use. He admitted in questioning by his attorney that he "should have started [the random UAs] already, but I've been trying to get housing and just, you know, trying to retrieve my things from my parents' house and still stay cordial with them. I mean I just haven't yet." RP at 104.

Another contested issue was why the parents had not secured housing. Ms. DeLancy testified that the Department does not have any control over the parents getting housing, but can confirm to the Department of Social and Health Services (DSHS) that the plan for a child is return home, which qualifies parents for a larger unit. She testified that she provided telephonic verification to DSHS on this score four different times. While the father testified that the delay in obtaining housing was due to the Department's

failure to provide written verification of the return home plan, Ms. DeLancy testified that the parents never told her they needed written verification, nor had written verification ever been requested by the housing agency to which the father testified he had applied. The father testified that he and the mother were still living in their car.

The trial court ruled at the conclusion of the hearing and later entered written findings and conclusions that the Department met its burden to show that M.A.B. was dependent under RCW 13.34.030(6)(c). In orally ruling, the court based its decision on evidence of the parents' extensive history with Child Protective Services and the Department, current substance abuse issues, and the parents' need for stable housing. The court found that the Department made reasonable but unsuccessful efforts to return M.A.B. to the parents' care and that he should remain in foster care until a disposition hearing.

The disposition hearing began on November 10, 2021, and was continued to November 24, and then to December 8, 2021. At the first of the three hearings the parents requested a modification of visitation, reporting that they had provided oral drug swabs to Ms. DeLancy the prior day and were engaging with parenting classes and a mental health assessment. The court was encouraged by the parents' engagement with services but denied the request to modify visitation. Before the second hearing, the Department filed a declaration by Ms. DeLancy testifying that the November 9 oral

swabs from the parents both tested positive for methamphetamine, amphetamine, and marijuana.

At later hearings, the Department confirmed the parents' progress with services, including engagement with parenting education, substance use evaluations, and mental health evaluations. The court responded that it was "very encouraged" by the parents' participation in services but recognized that the recent positive drug test results showed a need for more engagement. RP at 169. The court ruled that foster care placement was still necessary to provide for M.A.B.'s safety.

Both parents appeal. Their appeals have been consolidated.

ANALYSIS

Parents have a fundamental liberty interest to the care, custody, and companionship of their minor children. *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). The State has an interest in protecting the physical, mental, and emotional health of children, however, and "when a child's physical or mental health is seriously jeopardized by parental deficiencies, 'the State has a parens patriae right and responsibility to intervene to protect the child.'" *Id.* (quoting *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)).

A judicial declaration that a child is "dependent" will transfer legal custody of the child to the State. *Id.* at 942. The Department alleged that M.A.B. was dependent

because he "ha[d] no parent . . . capable of adequately caring for [him], such that [he is] in circumstances which constitute a danger of substantial damage to [his] psychological or physical development."  Clerk's Papers (CP) at 2; RCW 13.34.030(6)(c).  The trial court so found, and both parents challenge this factual finding, three supporting factual findings, and the trial court's legal conclusion that M.A.B. should be found dependent.[1]

In reviewing a finding of dependency, we do not reweigh evidence or reassess witness credibility.  *In re Dependency of C*A*.R*., 191 Wn. App. 601, 609, 365 P.3d 186 (2015).  We will affirm an order of dependency if substantial evidence supports the trial court's findings of fact and the findings support the conclusions of law.  *In re Dependency of M.P.*, 76 Wn. App. 87, 90, 882 P.2d 1180 (1994); *Schermer*, 161 Wn.2d at 940.  Given the preponderance standard applied in the fact-finding hearing, substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true.  *In re*

---

[1] The mother also assigns error to the trial court's ultimate findings on placement and reasonable efforts, but provides literally no argument in support.  The father appears to assign error to the court's ultimate findings on placement and reasonable efforts in the disposition order but he, too, provides literally no argument in support.  Any challenge to the disposition order would make relevant the positive test results from the parents' oral swabs provided on November 9.

Unargued assignments of error in an opening brief are deemed abandoned. *Lassila v. Wenatchee*, 89 Wn.2d 804, 809, 576 P.2d 54 (1978); *State v. Veltri*, 136 Wn. App. 818, 822-23, 150 P.3d 1178 (2007); *see* RAP 10.3(a)(6) (requiring argument in support of each assignment of error).  We do not address these assignments of error further.

No. 38656-2-III (consol. w/ No. 38669-4-III)
*In re Dependency of M.A.B.*

*Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013).  A dependency finding

under RCW 13.34.030(6)(c) need not be based on proof of actual harm, but instead can

rely on a danger of harm to the child.  *In re Welfare of A.B.*, 181 Wn. App. 45, 60, 323

P.3d 1062 (2014) (citing *Schermer*, 161 Wn.2d at 951).  A juvenile court has broad

discretion in determining when there exists a risk of harm.  *Id.* (citing *Schermer*, 161

Wn.2d at 951).

I.      SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDINGS 2.2.15,
        2.2.6, AND 2.2.16

        A.      *Finding 2.2.15*

        Both parents assign error to the trial court's finding 2.2.15, which states:

        [T]he parents['] drug use as testified to in this case puts the infant child at
        risk.  [M.A.B.] is an infant child who cannot care for himself.  Mother and
        father's denial of substance abuse despite both testing positive prevents
        them from moving forward with treatment and providing a safe and stable
        household for [M.A.B].  The court has broad discretion in determining
        whether a danger of harm exists in a dependency case and need not wait for
        actual harm to occur.  *In re Dependency of Schermer*, 161 Wash. 2d 927,
        951, 169 P.3d 452, 464 (2007).

CP at 133.  The father does not challenge the admissibility of the evidence that he tested

positive for methamphetamine, but challenges its sufficiency.  The mother raises an

evidentiary challenge.

                1. The testimony of Nurse Bourgeois and Ms. Mabee that M.A.B. and the
                   mother tested positive for methamphetamine was admissible substantive
                   evidence

10

The mother challenges the trial court's overruling of her hearsay objection to Nurse Bourgeois's testimony that hospital records contained results that M.A.B. and the mother tested positive for methamphetamine. The mother characterizes the evidence as "admitted only to show what action, if any, [the nurse] undertook to care for M.A.B. as a result," "not . . . for the truth of the matter asserted." Br. in Support of Mot. for Accelerated Rev. (Br. of Appellant (mother)) at 12. By citing *X.T.*, 174 Wn. App. at 737-39, the mother appears to believe that the trial court overruled her objection by finding Nurse Bourgeois's testimony admissible under ER 703 and 705. Under ER 703 and 705, a witness testifying as an expert can identify facts deemed material to his or her opinion, even though they are hearsay. The facts identified are not substantive evidence, however. *X.T.*, 174 Wn. App. at 737-38.

The mother concedes she did not object when Ms. Mabee testified that the same information about positive tests for methamphetamine was conveyed to the Department in the August 2nd referral. But she argues that Ms. Mabee, too, could recount hearsay under ER 703 and 705 without the hearsay being admissible as substantive evidence.

The Department does not perceive ER 703 and 705 to be the basis on which the trial court overruled the mother's objection. It characterizes the evidence as admitted under ER 803(a)(4). ER 803(a)(4) provides an exception to the hearsay rule for "[s]tatements . . . for purposes of medical diagnosis or treatment."

We review a trial court's interpretation of the rules of evidence de novo. *In re Welfare of M.R.*, __ Wn.2d __, 518 P.3d 214, 220 (2022). When a rule is correctly interpreted by the trial court, we review the decision to admit evidence under the rule for an abuse of discretion. *Id.*

If a trial court's reason for admitting evidence is erroneous, admitting it will not be disturbed on appeal if its admission is sustainable on alternative grounds. *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983). By extension, if the basis on which the trial court overruled the mother's objection is viewed as ambiguous, we will not disturb its ruling if it can be sustained on the ground argued by the Department.

The most common application of ER 803(a)(4) is to statements made by a patient for purposes of medical diagnosis and treatment. *E.g.*, *Spohn v. Dep't of Lab. & Indus.*, 20 Wn. App. 2d 373, 380, 499 P.3d 989 (2021). And ER 803(a)(4) is not generally viewed as the appropriate vehicle for introducing medical records; medical records are most commonly admitted as business records. 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.19 (6th ed. 2016); *e.g.*, *M.R*, 518 P.3d at 223. Yet the language of ER 803(a)(4) is broad[2] and may include statements made from one physician to another that convey information about a patient. 5C TEGLAND, *supra*, at

---

[2] The rule provides in relevant part that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history . . . insofar as reasonably pertinent to diagnosis or treatment," are not excluded by the hearsay rule.

§ 803.20. Professor Tegland posits that "a report by a medical laboratory to [a physician], for purposes of diagnosis or treatment [by the physician], may be within the hearsay exception." *Id.* This court held as much in *State v. Doerflinger*, 170 Wn. App. 650, 664, 285 P.3d 217 (2012), where ER 803(a)(4) was identified as one of several grounds on which a treating physician's testimony about information obtained from a radiologist's review of a CT[3] scan was admissible substantive evidence. The mother has not challenged the Department's argument that ER 803(a)(4) was the basis on which the court overruled her objection.

The same evidence came in through Ms. Mabee, and it is too late for the mother to argue that Ms. Mabee's testimony about the test result could have been nonsubstantive evidence offered under ER 703 and 705. The Department never said it was eliciting Ms. Mabee's testimony about the test results as merely facts relied on in forming an opinion. If the mother believed information Ms. Mabee obtained could be offered for only a limited purpose, she needed to make a timely objection and obtain a court ruling limiting its purpose.

Whether through Nurse Bourgeois or Ms. Mabee, the testimony that M.A.B. and the mother tested positive for methamphetamine was admissible substantive evidence.

---

[3] Computed tomography.

As for the court's finding that the mother's drug use puts M.A.B. at risk, the court heard extensive testimony about the parents' denial of substance abuse and their failure to obtain treatment not only in the current dependency, but in the prior dependency and termination proceedings. It was uncontested that M.A.B. is particularly vulnerable as an infant who cannot care for himself. Given the trial court's broad discretion to determine when a child faces a danger of harm, substantial evidence supported the trial court's finding that the mother's denial of substance abuse despite testing positive would prevent her from moving forward with treatment and providing a safe and stable household for M.A.B.

2. We will not reweigh evidence bearing on whether the father tested positive for methamphetamine as a result of his own use

The father argues on appeal that there was no evidence that he was a substance abuser other than his one positive oral swab on August 2, 2021, and Ms. Shu, the forensic expert, testified that the unintentional ingestion of methamphetamine when in proximity to a user could explain a positive test result. He contends his positive test result can be explained by his proximity to M.A.B.'s mother, "the known meth user." Appellant's Opening Br. (father) at 7.

At the fact-finding hearing, the father was asked if he knew methamphetamine use during pregnancy could hurt the baby, and he answered, "Of course." RP at 107. He was asked whether M.A.B.'s mother used any methamphetamine while pregnant, and he

answered, "No." *Id.* A reasonable fact-finder could infer that if the father never witnessed the mother using methamphetamine, it is unlikely he was in close enough proximity to unintentionally ingest her methamphetamine. A reasonable fact-finder could also disbelieve the father's report to the Department that he had not used methamphetamine. Either way, a reasonable fact-finder could infer that the father's positive test result was from his own use of methamphetamine. The trial court found the positive test result to be evidence of the father's own use, and we will not reweigh the evidence.

Here, too, M.A.B.'s particular vulnerability and the trial court's broad discretion in determining whether a child faces a danger of harm supports the finding that the father's denial of substance abuse despite testing positive would prevent him from moving forward with treatment and providing a safe and stable household for M.A.B.

B.      *Findings 2.2.6 and 2.2.16*

The father alone assigns error to the trial court's finding 2.2.6 and the mother alone assigns error to the trial court's finding 2.2.16. Both appear to be making a similar argument, however: that the trial court is placing excessive and improper reliance on evidence of their behavior during the dependencies of their four older children.

     1.  Reasonably read as referring to prior dependencies, finding 2.2.6 is supported by substantial evidence

The father assigns error to the trial court's finding 2.2.6, which states:

> During the dependency the parents['] visitation with the children were [sic] inconsistent and there was concern that the parents were under the influence of substances during a visit.

CP at 132. The father argues that this finding is "not supported by the evidence in the current case" and "was based on [Ms.] Gonzalez['s] testimony regarding the other children." Appellant's Opening Br. (father) at 6. He argues that the evidence about the parents' visitation with M.A.B. in the *current* dependency establishes that it has been consistent and without incident.

Reasonably read, the trial court's findings from finding 2.2.1 through 2.2.7 all deal with the dependency and termination proceedings involving the parents' four older children. In determining whether the trial court's findings support its conclusions of law, we will read finding 2.2.6 accordingly. As the father concedes, if finding 2.2.6 is read as relating to those earlier dependencies, it is supported by the testimony of Ms. Gonzalez.

### 2. The mother's challenge to finding 2.2.16 is insufficiently developed to warrant review

The mother assigns error to finding 2.2.16, which states:

[T]he parents['] history of past involvement with the department established a pattern of conduct, behavior, and/or inaction in regards to their children's health, safety, and welfare. The parents['] past history is a factor that a court may consider in weighing a parent's current fitness. *In re Dependency of J.C.*, 130 Wash. 2d 418, 428, 924 P.2d 21, 26 (1996). This court finds that a need for services existed in the prior dependency and the parents did not complete those services or remedy their parental deficiencies.

16

CP at 133.

The only discernible argument in the mother's brief that touches on this finding is her argument that "while past history may be relevant it does not demonstrate current parental deficiencies when it is over a year old, as in the present case." Br. of Appellant (mother) at 16. This challenges the legal proposition that past history can be considered in weighing current fitness, but not the factual content of the finding.

*Dependency of J.C.*, on which the trial court relies in finding 2.2.16, discussed a trial court's authority to consider a parent's history in applying former RCW 13.34.180(5) (1996) in a termination proceeding. 130 Wn.2d at 427-28. That statute requires the Department to demonstrate by clear and convincing evidence that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." Former RCW 13.34.180(5), recodified at RCW 13.34.180(1)(e). *J.C.* cites *In re Welfare of Ross*, 45 Wn.2d 654, 657, 277 P.2d 335 (1954), for the language about past history as a factor that can be considered in weighing current fitness. 130 Wn.2d at 428. But *Ross*, too, dealt with "whether a father or mother is to be permanently deprived of parental rights." 45 Wn.2d at 657. And what *Ross* actually says, in the context of the permanent deprivation of parental rights, is that

> the entire record of the parenthood is open to investigation and inquiry. *Remote happenings are perhaps entitled to little weight, but the juvenile court is entitled to the entire story before it acts.*

17

*Id.* at 657 (emphasis added); *and see In re Dependency of P.D.*, 58 Wn. App. 18, 27-28, 792 P.2d 159 (1990) (rejecting argument in termination proceeding that ER 404(b) applies and precludes evidence of a prior termination of the parents' rights).

The parties' assignment of error to finding 2.2.6 and finding 2.2.16 do not challenge the record's support for the factual content of those findings. They argue instead that the trial court should not have relied on the history of the dependencies of their older children as support for its conclusion that M.A.B. is dependent. We address that argument in connection with their final assignment of error.

II. SUBSTANTIAL EVIDENCE SUPPORTS THE TRIAL COURT'S FINDING THAT M.A.B. HAS NO CAPABLE PARENT AND THE TRIAL COURT'S FINDINGS SUPPORT ITS CONCLUSION THAT HE SHOULD BE FOUND DEPENDENT

The trial court found M.A.B. dependent under RCW 13.34.030(6)(c), as a child who "[h]as no parent . . . capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." There are no required factors for the court to consider in determining that a child is dependent. *CA.R.*, 191 Wn. App. at 608. "Dependencies based on RCW 13.34.030(6)(c) do not require a finding of parental unfitness; instead, they 'allow[ ] consideration of both a child's special needs and any

18

limitations or other circumstances which affect a parent's ability to respond to those needs.'" *Id.* (alteration in original) (quoting *Schermer*, 161 Wn.2d at 944).

As of the fact-finding hearing, the parents continued to live out of their van, and they had failed without reasonable excuse to engage in substance abuse assessment or participate in UAs. They declined to provide oral swabs. Not all of their prior history with the Department was necessarily relevant to the current dependency—for instance, prior inconsistency in visitation was not, where they were now consistently attending visitation. But the prior suspected substance abuse and refusal to participate in UAs or drug assessment services *was* relevant. It can be very difficult to become clean and sober. The fact that the parents had relinquished rights to four children in August 2020 rather than remediate their deficiencies, tested positive for methamphetamine use in August 2021, and were declining any further testing or treatment, was legitimately a major cause for concern.

Contrary to the father's contention on appeal, the Department did not disavow housing as a parental deficiency. The Department presented it as one of the major concerns. *E.g.*, RP at 14 ("They don't have safe and stable housing."), 19 ("The home where the van is parked . . .—it's not safe. It's full of trash."). Even the parents conceded that their living situation was untenable. *E.g.*, RP at 98 (describing the paternal

19

grandparents' house as unlivable "because of the smell"), 132 (describing the house as "horrible").

The trial court reasonably found that the parents' lack of minimally appropriate housing, and their refusal either to be tested for drug use or engage in assessment and treatment, rendered them incapable of adequately caring for infant M.A.B. The trial court's findings were supported by evidence and supported its conclusion that M.A.B. was a dependent child.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____          _____
Lawrence-Berrey, J.                                      Pennell, J.

20