[Nos. 71300-1-I; 71301-9-I.   Division One.   March 2, 2015.]

*In the Matter of the Dependency of* P.H.V.S.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent,*
v. HEIDI GABHART ET AL., *Appellants.*

*Sungah Annie Chung* (of *S. Annie Chung PLLC*), for appellant Heidi Gabhart.

*Kevin A. March* (of *Nielsen Broman & Koch PLLC*), for appellant Richard Smith.

*Robert W. Ferguson, Attorney General*, and *Kelly L. Taylor, Assistant*, for respondent.

¶1 SCHINDLER, J. — Richard Smith and Heidi Gabhart are the parents of P.H.V.S. Smith and Gabhart seek reversal of the order of dependency and the disposition order. The court found P.H.V.S. dependent because neither parent was capable of adequately caring for the child such that the circumstances constituted a substantial danger to the child's psychological or physical development under RCW 13.34.030(6)(c). Smith contends the absence of his guardian ad litem (GAL) during a portion of the dependency fact-finding hearing violated the mandatory statutory and GALR requirements and his right to due process. Smith also asserts insufficient evidence supports finding that he was not capable of adequately caring for P.H.V.S. or that the child was in circumstances constituting a danger of substantial harm. Gabhart contends insufficient evidence supports finding the Washington State Department of Social and Health Services made reasonable efforts to eliminate the need to remove P.H.V.S. Gabhart also asserts her attorney provided ineffective assistance of counsel and violation of her right to due process. We hold the absence of

Smith's GAL during a morning session of the four-day dependency fact-finding hearing violated the mandatory statutory and GALR requirements. However, because the record shows there was little or no risk of error, we hold there was no violation of his right to due process. We also hold that substantial evidence supports the finding of dependency under RCW 13.34.030(6)(c) and Gabhart cannot establish either ineffective assistance of counsel or violation of due process. Accordingly, we affirm.

## FACTS

¶2 Heidi Gabhart and Richard Smith have lived together since 2010. Gabhart and Smith are the parents of P.H.V.S., born on March 29, 2013.

¶3 Gabhart is the mother of three other children: 20-year-old F.O., 7-year-old J.S., and 4-year-old A.G. F.O. has lived with his father since the age of 13. In May 2007, the Washington State Department of Social and Health Services (Department) removed 6-month-old J.S. from Gabhart because of concerns about her "deteriorating mental health." The court found J.S. dependent and ordered Gabhart to participate in a psychological evaluation, mental health counseling, and medication management. Gabhart did not participate in services. The Department placed J.S. with her father.

¶4 A.G. was born in Nevada on September 7, 2008. While in the hospital, Nevada child protective services removed A.G. from Gabhart's care. Gabhart was diagnosed with paranoid schizophrenia. The court found A.G. dependent. Gabhart did not participate in mental health services or follow through with referrals for housing. In 2009, the court terminated Gabhart's parental rights to A.G.

¶5 In February 2013, Gabhart went to Dr. Nicole Ingrisano for prenatal care. Gabhart told Dr. Ingrisano that she had not engaged in mental health services for "well over a year" and had "no desire to be on medications." When Dr.

Ingrisano tried to talk to Gabhart about her mental health, Gabhart became "very easily agitated" and "angry." Gabhart made comments to Dr. Ingrisano about the father of the child, suggesting he was "temperamental and that she was looking at moving out from him because he could be violent." Concerned about Gabhart's ability to care for an infant, Dr. Ingrisano instructed the hospital to put a "hold" on the baby.

¶6 After P.H.V.S. was born on March 29, 2013, Dr. Ingrisano asked clinical social worker Jennifer Cruze to assess Gabhart. Cruze met with Gabhart on March 30. Gabhart told Cruze she had a diagnosis of "psychosis NOS"[1] and reported "hearing voices in her head sometimes." Gabhart said she was not engaged in mental health treatment and was not currently on any medication to treat her illness. Gabhart told Cruze that she received Social Security disability income "for her mental health diagnosis." Cruze made a referral to Washington State Department of Social and Health Services Child Protective Services (CPS).

¶7 CPS social worker Molly Rice met with Gabhart and Richard Smith at the hospital that same day. Beforehand, hospital staff told Rice that Gabhart reported having hallucinations and hearing voices. During the meeting, Rice had to repeat questions multiple times "due to [Gabhart] just not answering them." Rice said Smith's breath smelled of alcohol and he was "not able to answer questions directly."

¶8 CPS social worker Kyla Madsen met with Smith on April 1. Smith told Madsen that he had been " ' "taking care of [Gabhart]" for the last 2-3 years.' " Smith said that Gabhart had been " 'passing out, falling over, and losing consciousness for "years." ' " Madsen testified that Smith " 'appeared to have some cognitive delays or difficulty communicating in a clear way,' " and while he was " 'obviously concerned about both Mom and child,' " he " 'appeared unable to understand [the] severity of [the] circumstances.' "

---

[1] Not otherwise specified.

¶9 On April 2, Madsen, a CPS supervisor, Gabhart, Smith, and Smith's niece Amanda Twiggs-Johns attended a "Family Team Decision Making" meeting. During the meeting, Gabhart "almost passed out or fell asleep. Her eyes became groggy, her mouth was slightly agape, [and] her head bobbed." After approximately five to seven minutes, Gabhart "returned to a normal state and continued with the conversation." Gabhart said she had "a neurological condition." Twiggs-Johns told Madsen and the CPS supervisor that "the family has seen several instances where Mom has passed out during busy family functions." Twiggs-Johns said she did not think Smith "fully processed or understood the seriousness of Mom's condition." Twiggs-Johns did not know if Smith had a mental illness but said he "has behaviors that are concerning including his inability to clearly process information, communicate with others, and recognize the signs of Mom's condition."

¶10 On April 3, the Department filed a dependency petition, alleging the child was abused or neglected, or had no parent, guardian, or custodian capable of adequately caring for the child such that circumstances constituted a danger of substantial damage to the child's psychological or physical development under RCW 13.34.030(6)(b) and (c).

¶11 The Department recommended P.H.V.S. remain in out-of-home care, asserting Gabhart's untreated mental health issues constituted a danger to the child.

> The mother cannot control her behavior due to her significant mental health issues and this threatens child's well-being and safety. She is exhibiting psychotic like features in her behavior and has minimal insight into how her mental health impacts her parenting despite the assistance of multiple providers to facilitate her understanding. The mother's mental health issues prevent her from meeting child's cognitive, emotional, and developmental needs.

The Department alleged Smith's mental health status was unknown and he exhibited an "inability to recognize signs of concerns in Mom's behavior."

¶12 At the shelter care hearing on April 8, the court placed P.H.V.S. in foster care. The court entered an order requiring Gabhart and Smith to each obtain a psychological evaluation and follow treatment recommendations. The court authorized weekly supervised visits with P.H.V.S. and set a dependency fact-finding hearing for June 7.

¶13 In May, Smith's attorney Lorraine Roberts filed a motion to investigate Smith's competency and determine whether to appoint a GAL. The court appointed Shawn Crowley as the investigative GAL for Smith. In early June, Gabhart's attorney Matthew Pang asked the court to appoint a GAL to investigate Gabhart's competency. The court appointed Craig McDonald as the investigative GAL for Gabhart. The court continued the dependency fact-finding hearing to August 23.

¶14 Crowley recommended the court appoint a GAL for Smith. Crowley stated that Smith had "difficulty in comprehending abstractions" and because he was not "capable of weighing the merits of the various legal options involved in this case[,] I'm doubtful he can meaningfully assist his attorney beyond stating his goal of having the child returned home."

¶15 McDonald recommended the court appoint a GAL for Gabhart. McDonald stated Gabhart's "understanding of the legal process is, at best, minimal" and "she did not seem to retain information, veered off track and ultimately became unresponsive."

¶16 After holding separate competency hearings, the court ruled Smith and Gabhart were "not competent." The court found that neither Smith nor Gabhart could understand or intelligently "comprehend the significance of the legal proceedings and their effect on [his/her] best interests." The court appointed Crowley as the GAL for Smith

and McDonald as the GAL for Gabhart "to assist" each parent "in these dependency proceedings." The court continued the dependency fact-finding hearing to September 10.

¶17 The dependency fact-finding hearing began on October 22. Gabhart; her GAL, McDonald; her attorney Pang; Smith; his GAL, Crowley; his attorney Roberts; the court appointed special advocate (CASA) for P.H.V.S.; the attorney representing the CASA; the Department; and social worker Noemi Peredo appeared for the dependency fact-finding hearing. At the beginning of the hearing, Gabhart's attorney made a motion to continue the hearing until Gabhart was found competent. The court denied the motion to continue.

¶18 Fifteen witnesses testified during the four-day dependency fact-finding hearing, including Dr. Ingrisano, Cruze, Rice, Madsen, and Twiggs-Johns.

¶19 Cruze and Madsen testified the first day. Madsen testified that when she spoke with Smith at the hospital, "[h]is conversation just was very sporadic and all over the place." For instance, when Madsen asked Smith if he had any Native American ancestry, Smith told her that he was "100 percent White and that he had learned that he was full Irish. And then in the next breath he told me that he was 100 percent Aztec Indian and started talking about how Aztec Indians had all been . . . obliterated." Madsen stated that when she talked to Smith about his failure to recognize the severity of Gabhart's mental illness, Smith "got really upset with me and told me that I was twisting his words."

¶20 Five witnesses testified the second day, including Dr. Steven Haney, CPS social worker Rice, the CASA for P.H.V.S., a visitation supervisor, and a mental health crisis and intake specialist.

¶21 Dr. Haney conducted a mental health evaluation of Gabhart in April 2013. Dr. Haney testified that Gabhart reported hearing voices and "seemed somewhat depressed

and anxious." Dr. Haney diagnosed Gabhart with schizo-affective disorder. Dr. Haney said Gabhart told him she was hospitalized for mental health concerns in 2000 and again in 2007. Gabhart told Dr. Haney she was "put on a whole range of medications" after her first hospitalization but did not think the medications were helpful and stopped taking the medications altogether. Dr. Haney testified that Gabhart "did not have any insight into her mental illness and thus did not see herself as having mental illness."

¶22 The CASA for P.H.V.S., Jennifer Franklin, recommended P.H.V.S. remain in foster care. Franklin testified that after observing Gabhart and Smith interact with P.H.V.S., she did not believe they could "meet the basic needs of the baby." Franklin said the parents did not "respond to [the baby's] cues or seem to know what to do when she's upset." Franklin recommended Gabhart and Smith each obtain a psychological evaluation and parenting coaching.

¶23 Monet Frazier supervised visitation with P.H.V.S. Frazier said Smith and Gabhart "consistently come to all visits" but Gabhart would "nod off" during approximately half of the visits. Frazier testified that there was an ongoing problem with the parents preparing and feeding P.H.V.S., and she had to remind Smith "several times that he needed to support the baby's neck." Frazier said that after Gabhart and Smith began working with a parent coach, they were better able to respond to P.H.V.S. and seemed "more comfortable" around the baby. Frazier testified Gabhart typically did "the majority [of] all child care" during the visits, such as feeding and changing diapers, but Smith had "taken on a little bit more of that role in the last few weeks." Cross-examination of Frazier was not complete at the end of the second day of the fact-finding hearing.

¶24 Before the beginning of the third day of the dependency fact-finding hearing, Smith's court-appointed GAL sent an e-mail stating he did not plan to attend the morning session but wanted the court to proceed without him. The attorneys representing Smith and Gabhart did not object.

THE COURT: . . . I notice that Mr. Crowley's not here, but I understand he wants us to proceed without his — without him.

MR. McDONALD: Correct.

MR. PANG: That's what he indicated by e-mail.

MR. McDONALD: Correct.

¶25 During the morning session of the third day, the parties completed cross-examination of Frazier, Nevada social worker Natalie Miller testified, and the Department began the direct examination of social worker Noemi Peredo.

¶26 Miller testified that she was involved in the Nevada dependency and termination proceedings concerning A.G. Miller said that Gabhart appeared "erratic" and "delusional" but denied having any mental health issues.

¶27 Peredo testified that she had met with Gabhart and Smith at least three times a month for the past six months. Peredo said that Smith and Gabhart were "very responsive to the feedback that the parent coach gives them" but continued to ask "the same question again." Peredo testified that during the visits she supervised, Gabhart "tended to the baby." Smith "would be watching the mother and the baby" and "would only hold the baby, like, once or twice, and it wouldn't last for a very long time."

¶28 Crowley was present when the dependency fact-finding hearing reconvened for the afternoon session. During the afternoon session, Dr. Ingrisano and a mental health case manager who worked with Gabhart testified.

¶29 On the fourth and final day of the dependency fact-finding hearing, the Department recalled Peredo to complete direct examination and four other witnesses testified, including Twiggs-Johns and Dr. Maria Flores.

¶30 Peredo testified that Gabhart was no longer engaging in mental health treatment and that Gabhart told her she had stopped taking the medications "a few months" before September. Peredo testified that Smith gave "con-

flicting information" about whether he had ever sought mental health services or taken medication for a mental illness. Peredo reiterated that during the visits with P.H.V.S., Gabhart did the majority of the basic child care, like changing diapers, and that in the beginning, Smith was "really not engaged in holding the baby" and there was a "lack of interaction between the father and the baby." Peredo also repeated her concerns about Smith's "ability to process information" because he asked the same questions multiple times. Peredo testified that P.H.V.S. would "be at risk of neglect" if she were placed in her parents' care. Peredo stated that in her opinion, Gabhart and Smith were "not able to care for the child at this time."

> The mother has mental health issues that — and she has not seek [sic] consistent treatment for that. The father has confidence in the mother's ability to care for the child. And the father does not seem to have understanding of the mother's limited capacity to take care of herself and an infant.[2]

¶31 Dr. Flores had been Gabhart's primary care doctor since 2002. Dr. Flores testified that Gabhart had paranoid schizophrenia and was bipolar. Dr. Flores testified that Gabhart's symptoms had become worse over the last two years. Dr. Flores stated that she was concerned when Gabhart became pregnant with P.H.V.S. because she did not believe Gabhart would be able to care for a child. Dr. Flores said she never met Smith but her impression from Gabhart was that it "wasn't a stable relationship."

¶32 Gabhart frequently interrupted the hearing with inappropriate comments. On at least two occasions, Gabhart appeared to be "nodding off" and "her eyes rolled back in her head so that the whites showed." Gabhart requested medical attention after one of the episodes.

¶33 The court found P.H.V.S. dependent under RCW 13.34.030(6)(c) because neither parent was "capable of adequately parenting the child and there's danger of sub-

---

[2] Alteration in original.

stantial damage to the child's physical and psychological development." Because Smith was in denial about the seriousness of Gabhart's condition, the court found he was not able to assume responsibility as the primary caregiver.[3]

¶34 The court entered an order of dependency ordering P.H.V.S. to remain in out-of-home care. The order of disposition requires Gabhart to obtain mental health counseling and follow through with treatment recommendations, including taking medications as prescribed. The court ordered Smith to obtain a psychological evaluation "with parenting component and a cognitive component and follow through with any treatment recommendations."[4] Smith and Gabhart appeal the order of dependency and the disposition order.

---

[3] The court ruled, in pertinent part:

I think these parents want the child. They are trying. They're consistently going to the supervised visit. They're making as much effort as they can, but they have issues, psychological issues that are — it's making it very difficult for them to follow directions, comprehend, change behavior. . . .

But the concern of this Court is truly and profoundly the issue of the mother having some untreated mental health issue, Father appears to also, and the mother having some untreated medical issues. . . .

. . . I think it's undisputed that at the time the baby was born, at least, [Gabhart] wasn't taking her meds and she wasn't in any treatment. Her behavior in Court, both her mental behavior where she's not able to control herself and has some frequent outbursts — I'm saying "outburst" in the mildest manner. I mean, I don't — she's not, you know, loud and angry, but she is expressing her opinions inappropriately during court.

So my observation is that she's not able to manage her behavior. Plus she's had two, at least, medical incidents, one where 911 was called at her request because she was nodding off or passing out or something. . . . [I]f Mom is nodding off, there's a risk to the child's physical safety if she can't watch her.

There's argument that perhaps the father can pick up the slack. But the father has expressed to multiple witnesses that either she doesn't nod — the mother doesn't nods [sic] off or the mother is just tired from working. There's some denial going on . . . .

. . . .

. . . So there's concern that the father is not going to be able to pick up the slack in this case. That's my fear in this case about the baby. I hope both parents can have an evaluation done to determine what needs to be addressed in terms of their mental health issues, the mother can figure out what it is, is wrong medically.

I feel that the Department has proved by a preponderance that the child is dependent. And, frankly, if — I don't think the child is safe without some services.

[4] Emphasis omitted.

## ANALYSIS

*Absence of GAL*

¶35 Smith seeks reversal of the order of dependency on the grounds that the absence of his GAL during the morning session of the third day of the dependency fact-finding hearing violated RCW 4.08.060, the Guardian ad Litem Rules, and due process.

¶36 Under RCW 4.08.060, if an incapacitated person is a party to an action, he *"shall* appear by guardian."[5] RCW 4.08.060 provides, in pertinent part:

> When an incapacitated person is a party to an action in the superior courts he or she shall appear by guardian, or if he or she has no guardian, or in the opinion of the court the guardian is an improper person, the court shall appoint one to act as guardian ad litem.[6]

¶37 In *In re Welfare of Dill*, 60 Wn.2d 148, 150, 372 P.2d 541 (1962), the Washington Supreme Court held that the requirements of RCW 4.08.060 are "mandatory" and an incapacitated person "can appear in court only by a guardian ad litem or by a regularly appointed guardian."

¶38 In *Dill*, the Department filed a dependency petition, alleging the mother was mentally ill and the father could not care for the children. *Dill*, 60 Wn.2d at 149. Approximately six months after the mother was "adjudicated as mentally ill" and committed to Western State Hospital, she was "granted a terminal leave." *Dill*, 60 Wn.2d at 149-50.

---

[5] Emphasis added.

[6] It is well established that use of the word "shall" indicates a mandatory obligation. *See Amren v. City of Kalama*, 131 Wn.2d 25, 35, 929 P.2d 389 (1997); *Wash. State Coal. for Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 907-08, 949 P.2d 1291 (1997); *Strenge v. Clarke*, 89 Wn.2d 23, 29, 569 P.2d 60 (1977).

The Department filed a petition to terminate the parents' rights to the children. The mother and father appeared "with their attorney" at the termination hearing. *Dill*, 60 Wn.2d at 149. The court entered an order terminating the parents' rights to their children. *Dill*, 60 Wn.2d at 149.

■ ¶39 The Supreme Court reversed. The court rejected the argument that because the mother was represented by counsel, the statutory requirements were met. *Dill*, 60 Wn.2d at 150-51. "The statutory mandate is not satisfied when the person under legal disability is represented by an attorney." *Dill*, 60 Wn.2d at 150. The court held RCW 4.08.060 was mandatory and the mother could appear and participate only through a GAL. *Dill*, 60 Wn.2d at 150.

> A person under such legal disability can appear in court only by a guardian ad litem or by a regularly appointed guardian. A guardian ad litem has complete statutory power to represent the interests of the ward. *Rupe v. Robison*, 139 Wash. 592, 595, 247 Pac. 954 (1926). See, also, *In re Miller*, 26 Wn. (2d) 202, 173 P. (2d) 538 (1946).

*Dill*, 60 Wn.2d at 150.[7]

■■ ¶40 The GALR also impose a mandatory obligation on the GAL to be present at the fact-finding hearing. The purpose of the GALR is to "establish a minimum set of standards applicable to all superior court cases where the court appoints a guardian ad litem . . . to represent . . . an adjudicated incapacitated person pursuant to Title 11, 13 or 26 RCW." GALR 1(a). GALR 2(*l*) expressly states the GAL "shall appear at any hearing for which the duties of a guardian ad litem or any issues substantially within a guardian ad litem's duties and scope of appointment are to be addressed."

■ ¶41 Because the GAL had a mandatory obligation under RCW 4.08.060 and the GALR to attend and participate in the entire dependency fact-finding hearing, the

---

[7] Citation omitted.

court erred in proceeding without the presence of Smith's GAL. However, because the absence of the GAL during the morning session of the third day of the hearing created little or no risk of error, we conclude there is no due process violation.

¶42 The due process clause of the Fourteenth Amendment protects the rights of parents to the custody, care, and companionship of their children. *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992); U.S. CONST. amend. XIV. Parents have a fundamental liberty interest in the care and welfare of their minor children. *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). But this interest is not absolute. The State has a constitutionally protected parens patriae interest in protecting the best interests of the child and "the physical, mental, and emotional health of children." *In re Welfare of Sumey*, 94 Wn.2d 757, 762-63, 621 P.2d 108 (1980); *Schermer*, 161 Wn.2d at 941.

¶43 A dependency proceeding "is 'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." *Key*, 119 Wn.2d at 609 (quoting *In re A.W.*, 53 Wn. App. 22, 30, 765 P.2d 307 (1988)). Dependency proceedings are designed to protect children from harm, help parents alleviate the problems that led to intervention, and reunite families. *In re Interest of J.F.*, 109 Wn. App. 718, 728, 37 P.3d 1227 (2001). In the context of a dependency proceeding, the essential requirements of due process are notice, an opportunity to be heard, and the right to be represented by counsel. *Key*, 119 Wn.2d at 611. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). In determining whether a procedure violates due process, we must consider three factors: (1) the parents' interests, (2) the risk of error created by the procedures used, and (3) the countervailing governmental interest supporting use of the challenged procedure. *Key*, 119 Wn.2d at 610-11; *see*

*Mathews v. Eldridge,* 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *Santosky v. Kramer,* 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

¶44 Here, the record establishes little or no risk of error related to the absence of Smith's GAL at the morning session of the third day of the dependency fact-finding hearing. Nevada social worker Miller testified only about her involvement with Gabhart in the dependency and termination proceedings related to A.G.

¶45 Frazier's testimony concerning Smith's ability to parent P.H.V.S. repeated what she had testified to the day before. The day before, Frazier testified at length about her observations of Smith during the supervised visits with P.H.V.S. On cross-examination during the morning of the third day, Frazier repeated her earlier testimony that Gabhart was the primary caregiver during visits and that Gabhart and Smith asked "numerous" "[b]asic, necessary child care questions."

¶46 Peredo also testified during direct examination about Smith's ability to care for the child. Although Peredo's testimony during the morning session on the third day was critical of Smith's ability to care for P.H.V.S., Peredo repeated those same concerns when the Department continued direct examination and Smith and his GAL were present. Peredo reiterated that it was "strictly the mother that would be caring for the child" during visits and that she had to "make repeated statements" when "advis[ing] the father" because "he seems to forget information."[8]

¶47 We hold the absence of Smith's GAL during the morning session of the third day violated the mandatory

---

[8] The record also shows the court disregarded testimony that Smith asserts was prejudicial by crossing out a number of proposed findings. Specifically, the court crossed out proposed findings based on Peredo's testimony that Smith smelled of cigarette smoke and P.H.V.S. would cry because of the smell, that Smith did not follow the proper feeding schedule and repeatedly gave P.H.V.S. an empty bottle to suck on, and that there were "control issues between the parents." The court also refused to order the drug and alcohol evaluation Peredo recommended, ruling there was insufficient evidence to warrant doing so.

statutory requirements and GALR, and the court erred in proceeding without the presence of Smith's GAL. But because the absence of the GAL resulted in little or no risk of error, there is no due process violation.[9]

¶48 Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Cox and APPELWICK, JJ., concur.

Review denied at 184 Wn.2d 1017 (2015).

---

[9] Smith also contends his counsel provided ineffective assistance by failing to object to the absence of the GAL. Because we conclude the absence of the GAL did not violate due process, Smith cannot establish prejudice.