

**FILED**
**DECEMBER 6, 2022**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 38354-7-III |
| H.A.B. | ) | (Consolidated with |
| | ) | No. 38355-5-III) |
| ——————————————— | ) | |
| | ) | |
| In the Matter of the Dependency of | ) | |
| | ) | UNPUBLISHED OPINION |
| N.O.B. | ) | |

SIDDOWAY, C.J. — The father of now-15-year-old H.A.B. and now-12-year-old

N.O.B. appeals a juvenile court order finding the children dependent and establishing a

disposition plan.[1] The children's mother was killed seven months before the fact-finding

hearing and, at the time of the hearing, the children's father was charged with her death

as first degree murder. While the father stipulated to the children's dependency under

RCW 13.34.030(6)(c) (no capable parent), he unsuccessfully contested the request of the

Department of Children, Youth and Families (Department) that the children also be found

dependent under RCW 13.34.030(6)(b) (child is abused or neglected).

---

[1] To protect the privacy interests of juveniles, we identify them by initials and
refer to related individuals in such a way as to not disclose the juveniles' identity.
RAP 3.4; Gen. Orders of the Court of Appeals, *In re Changes to Case Title* (Wash. Ct.
App. Aug. 22, 2018).

The father challenges the juvenile court's conclusion that RCW 13.34.030(6)(b) was a basis for finding the children dependent. He also challenges the disposition order's requirement that he successfully complete a psychological evaluation.

The Department did not present evidence establishing the father's involvement in the mother's murder or any other abuse or neglect of the children by him in the 36 months preceding her murder. It did not present evidence that his earlier-occurring acts resulted, or likely resulted, in some enduring trauma. We accept the Department's concession that the subsection (b) dependency finding should be reversed.

The father presents no basis for reversing the order requiring him to complete a psychological evaluation, which is affirmed.

FACTS AND PROCEDURAL BACKGROUND

H.A.B. and N.O.B.'s parents separated in 2015 and divorced in 2019. After their separation, the mother began a relationship with Justin Sharp. In 2016, the mother and Mr. Sharp began living together with the children. In 2019, the mother, Mr. Sharp, and the children moved from Washington to Oregon.

The dependency proceedings on appeal were filed after the mother was found shot dead inside of her car that was parked not far from the father's apartment in Spokane. On that day, August 8, 2020, the mother arrived in Spokane to pick up the children and take them home to Oregon after their five-week visit with their father.

The father was the primary suspect in the mother's murder and was arrested at his apartment that day. Spokane police notified Child Protective Services (CPS) that the children, who had been with their father at the time of his arrest, had been taken into protective custody. The father was soon charged with the first degree murder of the mother and remained in custody pending trial.[2]

The Department filed dependency petitions for both children on August 11, 2020. The petitions alleged that each child was dependent because they were abused or neglected and/or had no parent capable of adequately caring for them, such that they were in circumstances presenting a danger of substantial damage to their psychological or physical development.

The father waived his rights to a hearing and agreed to the entry of a shelter care order.

A partially-contested fact-finding hearing was held on March 4, 2021. At some point during the course of the hearing, the father's lawyer informed the court that the father would stipulate to a subsection (c) dependency for the children (no capable parent), but disputed that there was a basis for a subsection (b) dependency (abuse or neglect). Since that was not clear at the hearing's inception, the Department presented evidence relevant to a finding of dependency under both definitions.

---

[2] The father was convicted of the murder in March 2022 and filed an appeal that is pending. Notice of Appeal, *State v. Beal*, No. 38844-1-III (Wash. Ct. App. Apr. 7, 2022) (on file with court). *See* ER 201 (a court may take judicial notice of adjudicative facts).

The Department presented testimony from CPS investigator Michelle Woodward and Deanna Estes, the social worker assigned by the Department. Mr. Sharp and Okanogan Sheriff's Deputy Gary Hirst also testified to a domestic dispute involving the father to which Deputy Hirst had responded while employed as a police officer for the city of Oroville. The father called no witnesses.

Ms. Woodward testified that she was assigned to the August 8, 2020 intake reporting the mother's murder and the father's arrest. In the course of her investigation, she interviewed the father and reviewed six prior CPS intakes of the family, going back to June 2010. As a result of her investigation, she arrived at a "founded" finding of abuse and neglect, based on negligent treatment of the children by the father. Narrative Report of Proceedings (NRP)[3] at 18; Clerk's Papers (CP) at 390.

Among the intakes reviewed by Ms. Woodward was one received in September 2017 from a mental health therapist who was working with H.A.B. H.A.B. had told the therapist that during a visit with her father he had "punched her in the stomach, in order to show her how to protect herself, and reported that the punch was hard enough to make

---

[3] The father's counsel filed a motion in this court contending that the record was inadequate for review given the number of points at which the audio recording of the fact-finding hearing was deemed inaudible by the transcriptionist. He asked this court to remand his appeal to the juvenile court to determine if the record could be reconstructed.

Instead, our Commissioner stayed the appeal to afford the juvenile court an opportunity to settle the record. The juvenile court ultimately adopted the Department's proposed Narrative Report of Proceedings, which is in the format of the original verbatim report of proceedings, supplemented at points originally reported as inaudible.

her nauseous." NRP at 26; CP at 398. The father became angry when H.A.B. refused to punch him back.

Another intake, also received in September 2017, was from the children's counselor. The counselor reported that the children recounted that during a recent visit with their father he became angry and "'lost it'": screaming, slamming his hands on the table, yelling, and punching holes in the wall. NRP at 28; CP at 400. The counselor also reported to CPS that the father had told the children their mother was going to die from a brain tumor that had been diagnosed in December 2016 and that she had suffered brain damage. (It was undisputed that the mother had been diagnosed with brain cancer in December 2016 and had undergone immediate surgery followed by radiation therapy.)

Most concerning was an intake from a crime victim advocate following a domestic violence incident that occurred on May 11, 2017. Mr. Sharp and Deputy Hirst were called to testify to their first-hand knowledge of that incident.

Deputy Hirst testified that he had responded to the May 11, 2017 report of a domestic dispute, which took place at a time when the mother and Mr. Sharp were living in Oroville. On the day of the report, he was approaching the mother's home when he saw the father walking northbound from the home with the children, both of whom were crying. The deputy stopped, got out of his police vehicle, and approached the father. He reminded the father that he had been trespassed from the mother's home, and said he needed to talk to him. The father said, "Fuck you," and continued walking away with the

children.  NRP at 59; CP at 431.  Even after the deputy told the father he was not free to leave, the father kept walking, ignoring the deputy other than to swear at him.

The deputy testified that N.O.B. got free and ran to his mother, but H.A.B. was still being gripped by her father.  The father initially had her by the hand, but when the deputy pulled his stun gun into a low ready position, the father grabbed H.A.B. under the chin and picked her up.  He appeared to be positioning H.A.B. to prevent Deputy Hirst from using his stun gun.  The deputy told the father to release her, as he was choking her.  When the father eventually put H.A.B. down, her mother pulled her away.  The deputy took the father to the ground with the assistance of a border patrol agent and two firefighters.  The father was arrested and later convicted of resisting arrest, obstruction of law enforcement, and criminal trespass.

Asked how the children responded to what was happening, Deputy Hirst testified, "They were scared.  They were crying.  They were saying they didn't want to go with [their father].  They were trying actively to get away from him."  NRP at 63; CP at 435.

Mr. Sharp also testified to the events of May 11, 2017.  He testified that a few weeks earlier, the father been verbally trespassed by police from Mr. Sharp's and the mother's home.  On the 11th, the father had contacted the mother with a request to have visitation time and the mother responded that it was not a good night for visitation.  Undeterred, the father arrived at the couple's home, knocked on the door, and when H.A.B. answered, grabbed her by the arm, pulled her outside, and began yelling

6

obscenities and invectives at Mr. Sharp and the mother. Mr. Sharp told the mother to call police, which she did. Among other abusive statements, the father asked Mr. Sharp, referring to the mother's postsurgical limitations, if he "really want[ed] to be with a retarded girl for the rest of [his] life." NRP at 94; CP at 466.

Although Mr. Sharp did not explain how N.O.B. got outside, he testified that once the father had both children in the front yard, the father put one over his shoulder and, dragging the other by the hand, began walking away from the home. He had made it about 50 yards down the street when Deputy Hirst arrived. Mr. Sharp and the mother watched their encounter. Asked about his concerns for the children, Mr. Sharp testified that he was most concerned about their emotional state. He testified that both of them were in tears, and while he did not believe the father would hurt the children, "he was definitely—creating a traumatizing situation[ ] for the children." *Id.*

At the conclusion of the hearing, the Department argued that a finding that the children were then abused or neglected was supported by following evidence:

- Ms. Woodward's "founded" finding of negligent treatment by the father following investigation of the August 8, 2022 intake,

- The father's actions on May 11, 2017,

- The father's past belittling of the mother, and

- Other intake history, and in particular, the father's striking H.A.B. in the stomach and punching holes in the walls.

*See* NRP at 103-05; CP at 475-77.

7

The father's lawyer argued that the evidence did not support the finding of a subsection (b) dependency where the father had never been charged with a domestic violence crime and the divorce decree revealed that the mother had not requested a protection or restraining order. The father's lawyer also reminded the court that the CPS intakes prior to the August 8, 2020 intake had been closed without "founded" findings.

In orally ruling at the conclusion of the hearing, the juvenile court explained its basis for believing that a subsection (b) basis for a dependency finding had been demonstrated:

> [I]t is uncontroverted that the father, as described by the police officer, grabbed his daughter by the neck and choked her while he was pulling her towards him. It is uncontroverted that he punched his daughter in the stomach—with enough force to cause her to be sick. It was uncontroverted that he reached inside the house and grabbed his daughter by the arm and yanked her out. It was also uncontroverted under several different circumstances that the father—elicited a—an extreme reaction from the parent—excuse me—from both of the children that indicated that there was very easily the infliction of fear of imminent physical harm, bodily injury or assault.
>
> Those are all considered to be domestic violence. Those are all considered to be child abuse. And those are all considered to be—would all be considered sufficient to satisfy a (b) finding under dependent child.

NRP at 117-18; CP at 489-90.

In entering written findings, the juvenile court did not call out the findings it viewed as supporting a subsection (b) dependency. But it incorporated its oral ruling. It entered a finding that Washington CPS records revealed six intakes for the family in and after 2010. It entered extensive findings about the father's conduct on May 11, 2017,

8

including that the father forcefully removed his children from the mother's home and used his daughter as a human shield to prevent Deputy Hirst from firing his stun gun and "[i]n doing so, he showed a disregard for the health and safety of his daughter." CP at 326 (Finding of Fact (FF) B(i)). It also found that "the historical trauma of this family including past CPS intakes, but specifically the incident that occurred on May 17, 2017 [sic],[4] raises to the level of abuse and neglect." CP at 325 (FF B(i)).

The court ordered the father to complete a domestic violence assessment, noting not only domestic violence toward the mother, but also domestic violence "that was perpetrated by [the father] on his own children." NRP at 119; CP at 491. The court also ordered the father to engage with mental health services including counseling, family therapy, and a psychological evaluation, and to follow treatment recommendations. It denied visitation based on its finding that contact was prohibited under an order in the pending prosecution and would be detrimental to the children.

The father appeals.

ANALYSIS

The father makes five assignments of error that we address as presenting two issues. First, he contends that insufficient evidence supports the juvenile court's finding that his children were "dependent children" under RCW 13.34.030(6)(b). Second, he

---

[4] The court cited May 17, 2017, as the day when Deputy Hirst responded to the father taking the children from the mother's home. This is in error, as testimony clearly established this incident occurred on May 11, 2017.

argues that the juvenile court erred in ordering him to undergo a psychological

evaluation.  We address the assigned errors in that order.

I.      INSUFFICIENT EVIDENCE SUPPORTS THE JUVENILE COURT'S FINDING THAT THE
        CHILDREN WERE "DEPENDENT" WITHIN THE MEANING OF RCW 13.34.030(6)(b)

The first issue, presented by the father's first four assignments of error, is whether

the evidence supports the juvenile court's finding that H.A.B. and N.O.B. are dependent

within the meaning of RCW 13.34.030(6)(b), which applies to a child who is "abused or

neglected as defined in chapter 26.44 RCW."

Child "abuse or neglect" is defined for purposes of chapter 26.44 as meaning

"sexual abuse, sexual exploitation, or injury of a child by any person under circumstances

which cause harm to the child's health, welfare, or safety . . . or the negligent treatment

or maltreatment of a child by a person responsible for or providing care to the child."

RCW 26.44.020(1) (emphasis added).  "Negligent treatment or maltreatment" is defined

as "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior,

or inaction, that evidences a serious disregard of consequences of such magnitude as

to constitute a clear and present danger to a child's health, welfare, or safety."

RCW 26.44.020(19) (emphasis added).

The father's second through fourth assignments of error include citations to the

court's findings B(c), B(d), B(e), B(f), B(i) and B(j).  Br. of Appellant at 1.  But nowhere

in his brief does he identify any statement in the paragraph-long findings that he contends

is unsupported by substantial evidence, or why. His only argument is that some events relied on by the court were "stale"—not that they did not occur. Br. of Appellant at 1.

We address his staleness argument below. Since he fails to argue any basis on which the court's findings are otherwise unsupported, the findings are verities for purpose of the appeal. *Lassila v. City of Wenatchee*, 89 Wn.2d 804, 809-10, 576 P.2d 54 (1978) (unargued assignments of error in an opening brief are deemed abandoned); *In re Dependency of O.R.L.*, 191 Wn. App. 589, 597, 364 P.3d 162 (2015) (citing *In re Interest of Mahaney*, 146 Wn.2d 878, 895, 51 P.3d 776 (2002) (unchallenged findings are verities on appeal)).

For reasons the record does not reveal, the Department did not present evidence from which the juvenile court could find that the father murdered the children's mother.[5] What *was* presented was evidence of almost three-year-old or older events, none of which resulted in a relevant criminal charge, a CPS "founded" finding, or even a more than a short-term protection order. Current abuse or neglect can be proved by the cumulative effect of negligent treatment or maltreatment. But the record suggests the father exercised visitation for almost three years, from mid-September 2017 on, without any

---

[5] We assume but do not decide (since it is not briefed) that proof that the father murdered the mother would evidence a serious disregard of consequences presenting a clear and present danger to the children's welfare or safety, and thereby negligent treatment or maltreatment. The father's lawyer and the juvenile court observed during the hearing that the father was presumed innocent, which is true, but the presumption could have been overcome in the fact-finding hearing by a preponderance of evidence.

neglect or abuse of the children.[6] There was no testimony from any mental health provider that the children were suffering, or likely had suffered, enduring harm from events dating back to September 2017 or earlier.

The Department concedes that the "evidence of past instances of abuse and neglect . . . does not support a subsection (b) dependency due to its age and extent," and while "[the father]'s deficiencies are clear from the record[,] . . . the facts presented at trial are likely not sufficient." Br. of Resp't at 19-20.

Where there was no evidence presented that the father caused or contributed to the mother's death, we accept the State's concession that the evidence was insufficient. We reverse that part of the juvenile court's finding of fact "C" that "the Department met its burden in establishing dependence to the children pursuant to RCW 13.34.030(6)(b) (abuse or neglect)." CP at 326.

II.    THE JUVENILE COURT DID NOT ABUSE ITS DISCRETION IN ORDERING THE FATHER TO
       UNDERGO A PSYCHOLOGICAL EVALUATION

The remaining issue, presented by the father's fifth assignment of error, is to the requirement of the disposition order that he "[s]uccessfully complete a psychological

---

[6] Mr. Sharp testified to difficulty encountered when he and the mother sought to pick up the children following the children's five week visitation with the father in 2019. But his testimony described only friction and police involvement in the dealings between the adults, not any abuse of the children. A child's exposure to "domestic violence . . . that is perpetrated against someone other than the child does not constitute negligent treatment or maltreatment in and of itself." RCW 26.44.020(19).

The Department did not argue that the 2019 exchange was a basis for a subsection (b) finding nor did the juvenile court refer to it in its oral or written findings.

12

evaluation with a provider approved by the parties or ordered by the court and follow all recommendations." CP at 327. He renews an argument made at trial that the evaluation ordered was not for the purpose of remedying any identified parental deficiency. He also raises three constitutional arguments for the first time on appeal.

A.      The juvenile court did not abuse its discretion in concluding that a psychological evaluation would address a parental deficiency

The court may order the provision of services only "for the specific purpose of making reasonable efforts to remedy parental deficiencies identified in a dependency proceeding under this chapter." RCW 13.34.025(2)(d). It may not order services to determine whether the parent *has* a problem. *In re Interest of S.G.*, 140 Wn. App. 461, 166 P.3d 802 (2007). Remedial services are those services defined in the federal adoption and safe families act as family reunification services that facilitate the reunification of the child safely and appropriately within a timely fashion. RCW 13.34.025(2)(a). They include "individual, group, and family counseling; substance abuse treatment services; mental health services; assistance to address domestic violence; services designed to provide temporary child care and therapeutic services for families; and transportation to or from any of the above services and activities." *Id.*

We review the juvenile court's decision to order a particular service for abuse of discretion. *In re Dependency of W.W.S.*, 14 Wn. App. 2d 342, 364, 469 P.3d 1190 (2020). Its discretion in dealing with matters of child welfare is broad. *In re Dependency*

*of D.C.-M.*, 162 Wn. App. 149, 158, 253 P.3d 112 (2011).  The juvenile court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Id.*

Social worker Estes testified the Department was recommending a psychological evaluation based on several reasons for concern about the father's mental health: evidence of his uncontrolled emotional outbursts; threats he had made in the past toward the mother and later, toward anyone who assumed the care of his children; and the very serious current circumstances of his charge and incarceration.  Ms. Estes had interviewed the father and believed he was not processing the severity of his situation.  She testified that a psychological evaluation would "provide good insight as to any additional services . . . that would be helpful in reunification down the road."  NRP at 71; CP at 443.

On cross-examination, she conceded that she had no information that the father had ever been diagnosed with a mental health condition and no information he had ever engaged in a mental health service.

In ordering services for the father, the juvenile court observed that services "need to be tied to . . . parental deficiencies" and stated that a psychological evaluation was necessary in light of the father's history and the trauma attendant to his present circumstance of being incarcerated and suspected of murdering his children's mother. NRP at 118-19; CP at 490-91.

14

The father likens the ordering of a psychological evaluation in his case to orders of services that were found to be unrelated to a parental deficiency and were vacated or reversed in *D.C.-M.* and in *W.W.S.*

In *D.C.-M.*, this court held that the record was inadequate to support the ordering of a psychosexual evaluation that the court was concerned might include a compulsory polygraph component, where "the order was based solely on . . . allegations . . . which the police and DSHS[7] determined to be unfounded" and "the juvenile court did not state how the examination would be a service that would assist the family with reunification." 162 Wn. App. at 162. Moreover, while the order requiring the psychosexual examination was vacated on appeal, the case was remanded with directions to the juvenile court to review the need for a psychosexual examination anew, including whether limitations should be imposed on any polygraph component. *Id.* at 162-63.

In *W.W.S.*, this court reversed an order that a mother submit to random urinalysis (UAs) once a week for 90 days and, additionally, up to 6 times per month upon the Department's suspicion of use. 14 Wn. App. 2d at 350. It observed that the urinalysis requirement was based primarily on the testimony of the Department social worker, but when asked at the fact-finding hearing why she suspected drug use, the social worker

---

[7] "DSHS" refers to the Department of Social and Health Services, which formerly performed services now performed by the Department of Children, Youth, and Families. *See* Second Engrossed Second Substitute H.B. 1661, 65th Leg., 3rd Spec. Sess. (Wash. 2017).

testified only to seeing pockmarks on the mother on several occasions. *Id.* at 365. She later identified the mother's unpredictable, hostile, and demanding behavior as possible evidence of drug use without explaining why—nor did she reconcile this later testimony with her earlier attribution of this behavior to mental health issues. *Id.* Asked at the disposition hearing why she was requesting urinalysis, the social worker responded that "'the Department would hope that random UAs would motivate [the mother] to lead a clean and sober life'" and "'[m]aybe to rule out drug use'"—an explanation this court observed "would justify subjecting *any* parent to urinalysis." *Id.*

Here, the father did not challenge the incidents and observations relied on by Ms. Estes as the basis for Department concerns and, to the extent reflected in the juvenile court's findings, they are verities on appeal. The father had exhibited emotional and volatile reactions to issues involving the children in the past, including to make threats. He was now having to deal with the death of their mother and his pending prosecution.

The juvenile court was aware that the purpose of any service ordered must be to address a parental deficiency, and perceived that to be the case with the psychological evaluation. Dependency proceedings are designed to protect children from harm, help parents alleviate the problems that led to intervention, and reunite families. *In re Dependency of P.H.V.S.*, 186 Wn. App. 167, 181, 339 P.3d 225 (2015). The father does not demonstrate that the juvenile court abused its discretion in finding that a

16

psychological evaluation would address identified bases for concern about the father's

mental health.

B.      The father fails to demonstrate any constitutional right that is violated by
        the court-ordered psychological evaluation

For the first time on appeal, the father argues that the order requiring him to

complete a psychological evaluation violates his right to substantive due process, his

Fifth Amendment to the United States Constitution privilege against self-incrimination,

and his privacy right under the Washington Constitution.[8]

*Substantive due process*

The father cites *In re Parental Rights to K.J.B.*, 187 Wn.2d 592, 387 P.3d 1072

(2017), for the well-settled proposition that the due process clause of the Fourteenth

Amendment to the United States Constitution protects the *parent-child relationship* from

unwarranted government intrusion.  Br. of Appellant at 32.  *K.J.B.* also reviews

Washington's statutory scheme for termination of parental rights and recognizes it as a

constitutionally defensible intrusion.  187 Wn.2d at 606.

From *K.J.B.*'s discussion of the Fourteenth Amendment's protection of the parent-

child relationship, the father leaps to the proposition that "[s]ubstantive due process also

protects the fundamental right to be free from the type of highly invasive procedures

---

[8] Also interspersed in this section of his brief are allusions to procedural due process, but since no cogent procedural due process challenge is ever articulated, we disregard those allusions.  Br. of Appellant at 30-38.

17

implicated by a psychological examination, including a parent's due process right to be free from unwarranted searches or seizures. Const. amends. 5, 14; Const. art. 1, § 3." Br. of Appellant at 32. His only support for this contention is language from a 1976 California decision that describes what a psychiatric examination entails. Br. of Appellant at 33 (quoting *Edwards v. Super. Ct.*, 16 Cal. 3d 905, 907, 549 P.2d 846, 130 Cal. Rptr. 14 (1976)). The California decision affirmed a court order that the plaintiff undergo a four-hour psychiatric examination by a psychiatrist selected by the defense, without her lawyer present. The decision provides no support for the father's claim of a substantive due process violation.

In *In re Detention of Herrick*, 190 Wn.2d 236, 245-46, 412 P.3d 293 (2018), an appeal from sexually violent predator proceedings, the Washington Supreme Court held that even statutorily-authorized penile plethysmograph testing, which it "recognize[d] . . . is intrusive," does not violate substantive due process. The father offers literally no argument why ordering a less intrusive psychological evaluation for the purpose of correcting an identified deficiency in a child dependency proceeding violates substantive due process. "'[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" *In re Request of Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986) (quoting *United States v. Phillips*, 433 F.2d 1364, 1366 (8th Cir. 1970)).

*Fifth Amendment privilege against self-incrimination*

As the father correctly observes, "One's Fifth Amendment [privilege] against self-incrimination may be raised in any proceeding, 'civil or criminal, formal or informal, where the answers might incriminate [the questioned person] in future criminal proceedings.['']" Br. of Appellant at 33-34 (second alteration in original). The trial court's order requires him to undergo the evaluation, but he is free to invoke his Fifth Amendment privilege if the evaluation touches on incriminating matters. *Cf.*, *In re Dependency of A.M.-S.*, 196 Wn.2d 439, 447, 474 P.3d 560 (2020) ("There is no indication that the father was prevented from invoking the Fifth Amendment in response to any specific question asked at his evaluation, and he concedes that information provided at a court-ordered evaluation in the course of a dependency proceeding is not the equivalent of compelled testimony for constitutional purposes.").

Nevertheless, the father contends on appeal that "the dependency court was obligated to narrowly tailor its order" but "did not," citing *D.C.-M.*, 162 Wn. App. at 163. Br. of Appellant at 35. *D.C.-M.* does not hold that a dependency court is required to impose limitations on an evaluation that are never requested. Rather, in remanding D.C.-M.'s mother's appeal to the juvenile court with directions to reexamine the necessity for a psychosexual evaluation, the appellate court pointed out that if a compulsory polygraph examination was a component, "the juvenile court . . . could exempt a parent from answering incriminating questions during the examination."

*D.C.-M.*, 162 Wn. App. at 163.  *D.C.-M.* does not say that in earlier ordering the psychosexual examination the trial court should have imposed limitations sua sponte.

The father argued against a court-ordered psychological evaluation in the juvenile court, but he never moved the juvenile court for a protective order or any limitation on the evaluation.  He provides no reason why, if he now desires some limitation or protection, he cannot raise that issue in the juvenile court.  No legal authority is cited that required the juvenile court to raise the issue for him.

### *Right to privacy*

Finally, the father argues that the court-ordered psychological evaluation was an invasion of privacy without authority of law under article I, section 7 of the Washington Constitution.[9]

Two interests are protected by our state constitution's privacy right: "the right to autonomous decision-making" and "the right to nondisclosure of intimate personal information, or confidentiality."  *Wash. Pub. Emps. Ass'n v. Wash. State Ctr. for Childhood Deafness & Hr'g Loss*, 194 Wn.2d 484, 504, 450 P.3d 601 (2019); *In re Juveniles A, B, C, D, E*, 121 Wn.2d 80, 96-97, 847 P.2d 455 (1993).  As pointed out by the Department, the autonomy interest is a fundamental right subject to strict scrutiny protection, while the confidentiality interest is not.  *Wash. Pub. Emps. Ass'n*, 194 Wn.2d

---

[9] Article I, section 7 provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

at 504.  Courts apply only rational basis analysis to determine whether the disclosure of personal information serves a legitimate government interest, is carefully tailored to serve that interest, and is no greater than is reasonably necessary.  *Id.* at 505.

This case presents only an issue of nondisclosure of intimate personal information or confidentiality.  The father, who assumes strict scrutiny applies, presents us with no argument why an evaluation that can only be court-ordered in a dependency for the purpose of remedying an identified parental deficiency would fail rational basis review.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Staab, J.

Fearing, J.

21